**UNITED STATES of America, Appellee,**

v.

**Robert EVANS, Jr., Appellant.**

**No. 79–5290.**

United States Court of Appeals,
Fourth Circuit.

Argued July 10, 1980.

Decided Dec. 18, 1980.

Stanley J. Reed, Asst. Federal Public Defender, Baltimore, Md. (Charles G. Bernstein, Federal Public Defender, John H. Morris, Asst. Federal Public Defender, Baltimore, Md., on brief), for appellant.

Edward M. Norton, Jr., Asst. U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty., Baltimore, Md., Trudy Bond Foster, Third Year Law Student on brief), for appellee.

Before WINTER, MURNAGHAN and ERVIN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Evans was found guilty of bank robbery. 18 U.S.C. § 2113. He was personally identified as the perpetrator by two eyewitnesses. Bait money taken in the robbery was found on the premises in which he resided. Evans had gone on a substantial spending spree, beginning at a time subsequent to the date of the robbery.

Evans assigns as error the refusal to permit Evans' former girlfriend and co-worker, Denise Dawkins, to testify about a conversation she had held with him. She would have quoted him as explaining his sudden wealth as the consequence of his concealing on his residential premises a bank robbery fugitive, from whom he claimed to have received $10,000.

■ Evans' theory was that he was admitting that he had committed the crime of harboring a fugitive, 18 U.S.C. § 3, or of receiving stolen bank funds, 18 U.S.C. § 2113(c) and so was making a declaration against interest, which under Fed.R. of Evid. 804(b)(3), could come in, although hearsay. The penalties for harboring are markedly less than those for bank robbery. There is a 25 year maximum for bank robbery where, as here, there is the aggravation of assault with a dangerous weapon. There is a 10 year maximum for receiving stolen bank funds, and a maximum sentence for being an accessory equal to one-half of the maximum prescribed for punishment of the principal.

It may well be doubted whether a statement satisfies the declaration against interest exception to the hearsay rule where, viewed in narrow context, it technically constitutes a confession of crime and so is "against interest," but in actuality, the principal, and perhaps only function of the statement is to support a defense against a charge of a more serious crime. In reality, looked at in its totality, the statement is one *for* the declarant's penal interest, not *against*.

However, we need not resolve that question,[1] for Fed.R. of Evid. § 804(b)(3), establishes a further requirement denying admissibility to a declaration against interest to exculpate the accused "unless corroborating circumstances clearly indicate the trustworthiness of the statement." The more general Fed.R. of Evid. § 804(b)(5) similarly requires "equivalent circumstantial guarantees of trustworthiness."

It was established that the spending spree of the defendant, Evans, began on May 3, 1979, the day after the robbery and several days before his contact on May 7, 1979 with the supposed bank robber whom he claimed to have secreted. The amount traced to Evans within the critical period, computed on expenditures comprising the spending spree plus the $11,814 in cash found in his residence by the F.B.I. greatly exceeded the $10,000 which the proffered testimony would have placed in the defendant's hands. Consequently, the testimony was not sufficiently trustworthy to warrant its admission. The trial judge did not err in excluding it.

█ The second contention of the defendant concerns the constitution of the jury. Shortly after the case had been committed to the jury and it had retired to commence deliberations, one member grew concerned about his hearing, during a break in the proceedings, a discussion of defendant by persons in or about the courtroom. He communicated the fact of his concern to the judge, following which the judge questioned him, and determined that he should be excused from further participation in the case. The defendant does not assert that discharge of that juror constituted error.

The judge had commenced but not completed his explanation that the defendant had the alternative of insisting on a mistrial or of electing to proceed with the eleven remaining jurors. *See* Fed.R.Crim.P. 23(b). The defendant had made clear that he preferred an alternative which would permit the case to continue, and that he did not want a mistrial, and the consequent beginning all over again before a different jury.[2]

At this point, the first alternate juror, who had been discharged when the original twelve person jury retired to reach a ver-

---

1. Similarly we need not explore whether defendant, through invoking the privilege against self-incrimination, was unavailable for the purposes of Fed.R. of Evid. § 804. " 'Unavailability' as a witness includes situations in which the declarant is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement", Fed.R. of Evid. § 804(a)(1). However, Rule 804(a) further provides that a "declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying."

The situation is further complicated by the question of whether the words "declarant" and "accused" as used in Fed.R. of Evid. § 804(b)(3) must be deemed mutually exclusive or whether on occasion an accused's own statement could be introduced on the grounds that the same individual was both declarant and accused. *Cf.*

2. Through a mix-up no record was preserved of the colloquies to this point concerning the alternatives open to the defendant. The failure is most regrettable, but evidently inadvertent. Counsel stipulated for the purposes of the appeal that the defendant had gone so far as to say that he did not want a mistrial, but preferred to continue. There is no stipulation and hence nothing to establish whether the defendant opted for an eleven man jury or against an eleven man jury, or, as appears most probable, had expressed no conclusion for or against an eleven man jury.

*United States v. Thomas*, 571 F.2d 285, 288 (5th Cir. 1978), with *United States v. Bennett*, 539 F.2d 45, 54 (10th Cir. 1976), *cert. denied*, 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976). We shall assume for the purposes of this case, but expressly without deciding, that the defendant was "unavailable," and that he qualified as the declarant.

dict (Fed.R.Crim.P. 24(c)), happened back into the courtroom. She was questioned as to what if anything might have occurred in the way of discussion of the case with others, to destroy her impartiality or otherwise to render her unable to function as a juror. She replied that she had not discussed the case with anyone. The possibility of an eleven man jury seems to have received no further consideration.

The defendant expressed himself unequivocally in favor of proceeding with a twelve member jury comprised of the original eleven, with the first alternate added.[3] While nothing further was said about the eleven man jury alternative, certainly the defendant knew of it as a possibility, and no one denied him or tried to dissuade him from that alternative. We conclude that the twelve member jury as ultimately constituted was the intelligent, preferred choice of the defendant himself, and that implicitly the defendant had made clear his preference to it over a jury made up of only the original eleven members still remaining.[4]

■ The question thus boils down to whether the jury, as ultimately composed, by reason of violation of Rule 24(c) of the Federal Rules of Criminal Procedure or on constitutional grounds was so fundamentally unfair that even a knowing attempt at waiver would be unavailing. Fed.R.Crim.P. 24(c) states that an "alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." The rule does not purport, however, to deny power to the trial court to reconstitute someone as a juror who previously has been discharged. Furthermore discharge of Alternate Juror No. 1 was not actually mandated in the present case by

the language of the rule inasmuch as she did, in fact, replace a regular juror. *United States v. Baccari*, 489 F.2d 274 (10th Cir. 1973), *cert. denied*, 417 U.S. 914, 94 S.Ct. 2614, 41 L.Ed.2d 218 (1974) concerned the very situation. "At the close of argument and before the jury retired to begin its deliberations, the alternate juror was discharged as required by Fed.R.Crim.P. 24(c). During and near the outset of the deliberations one of the regular jurors became incapacitated and had to be hospitalized .... After discussing various alternatives, it was agreed by all parties that the alternate juror should be recalled and the deliberations continued." 489 F.2d at 275. The Court concluded "that in consenting to the substitution the defendants knowingly waived any objections that could have been interposed. The criteria for effective waiver of constitutional jury rights set forth in *Patton v. United States*, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930), are well satisfied under the circumstances." *Id.*

■ We therefore must turn to the question of fundamental fairness or unfairness of what took place. On that point we are satisfied that the jury in the end was made up of twelve people who properly could dispose of the case. There would be no question had the first alternate juror been added to the jury before it retired. During the time she was discharged, no contamination of her state of mind took place. If a defendant prefers to go ahead with essentially the jury with respect to which he had been placed in jeopardy, he should not be forced to accept a whole new trial, with the consequence of being placed in jeopardy a second time, if his decision to move ahead

---

**3.** He did so in the face of contrary advice from his counsel that he take a mistrial. Defendant's counsel pointed out the possible adverse effect of anything the discharged juror might have told his colleagues after the jury, as originally constituted, first retired to deliberate on its verdict.

The possible consequences of there having been some prior deliberations by the original twelve person jury are but conjectures, as favorable or unfavorable to the defendant as to

the Government. In making a conscious choice to proceed with the substituted alternate juror, Evans gained whatever speculative advantage and accepted whatever theoretical detriment that might inherently exist in the situation.

**4.** As an abstraction, it is generally supposed that the larger the number of jurors, the less the likelihood of the absolute unanimity required for a guilty verdict.

is, as here, knowing and intelligent.[5] In short, with the defendant's knowing preference for going ahead with the alternate juror added to the eleven remaining jurors, manifest necessity to declare a mistrial had been dissipated.[6] There was no fundamental unfairness. *Cf. Henderson v. Lane*, 613 F.2d 175 (7th Cir. 1980). It was appropriate to conclude that the defendant was in a superior position to decide in the circumstances what was best for him, rather than have his decision overridden by the judge. In the event, his hopes were not borne out; the jury found him guilty. But the defendant as well or better than the trial judge could ascertain whether he would have had any better chance or as good a chance with any other jury.

■ Defendant further contends that the jury was only told to continue its deliberations, and not specifically to begin them entirely anew. Yet no objection was raised as to the point. Nothing precluded the jury from starting from the very beginning all over again. The speculative assertion of prejudice from the unexceptional instruction, to which no objection was raised, was insufficient to justify reversal.

*AFFIRMED.*

ERVIN, Circuit Judge, dissenting.

Believing that the procedure employed by the trial judge in replacing a regular juror with an alternate juror after the jury had

---

**5.** Two Fourth Circuit cases arguably bearing on the matter are distinguishable since they concerned situations involving a group of thirteen jurors. The earlier of the cases, *United States v. Virginia Erection Corp.*, 335 F.2d 868 (4th Cir. 1964) noted that the presence of the thirteenth person in the jury room amounted to a palpable violation of Fed.R.Crim.P. § 23(b): "Juries shall be of 12 but ... the parties may stipulate ... that the jury shall consist of any number less than 12." In the language of Judge Boreman in *Virginia Erection*, "twelve is the magic number." Either the defendants in *Virginia Erection* had a jury of 13, or had the impermissible interference of a non-juror present while deliberations were conducted. As the court was careful to point out, consent to inclusion of an alternate juror came only from counsel, but not, unlike the situation in the present case, from the defendants themselves.

There is language in the *Virginia Erection* opinion which casts doubts on whether a juror once discharged can be reactivated. But that issue was not presented by the actual fact situation and so, the statements were inevitably dicta. The same may be said of the assertion in the *Virginia Erection* opinion of the related proposition: "Rule 24(c) patently makes no provision for the replacement of a juror who becomes disabled after the jury retires to deliberate." While the statement may in itself well be true, the Court was not called upon to consider the effect of a conscious waiver by the defendant himself if replacement occurs after the jury retires to deliberate. Even less did *Virginia Erection* concern whether knowing waiver would suffice to moot the objection.

In the second Fourth Circuit case, *United States v. Chatman*, 584 F.2d 1358 (1978) the inclusion of an alternate, a thirteenth juror, when deliberations began was purely an inadvertence. There was no consent by defendants

or counsel. In following *Virginia Erection*, the Court carefully restricted itself to the holdings of the case namely:

(1) no personal consent of the defendant,
(2) the presence of the thirteenth juror was a flat violation of the maximum of 12 called for in the Federal Rules of Criminal Procedure,
(3) the presence of the thirteenth juror permitted a possibility, not subject to correction or elimination, of an unwarranted influence on the deliberations of the proper 12, even if the thirteenth remained mute, the presence of the thirteenth in any event violating the privacy and secrecy of the jury.

None of those objections applies in the instant case, for the defendant clearly consented, and at no time were there ever more than twelve jurors. *Cf. Leser v. United States*, 358 F.2d 313, 318 (9th Cir. 1966), *cert. dismissed* 385 U.S. 802, 87 S.Ct. 10, 17 L.Ed.2d 49 (1966): "In the instant case there is nothing in the record to suggest that more than twelve jurors were present during the deliberations of the jury."

Of no little pertinence is the consideration that the Tenth Circuit in *United States v. Beasley*, 464 F.2d 468 (10th Cir. 1972) had an inadvertent thirteenth juror situation and followed *Virginia Erection*. Yet when the case of *United States v. Baccari, supra*, arose, presenting the Tenth Circuit with the very situation with which we are confronted, the Tenth Circuit distinguished *Virginia Erection* and *Beasley* to uphold the convictions. It did so on the grounds that a thirteenth juror was present, and that the defendants' personal consent had not been obtained, the very considerations to which we have, earlier in this footnote, alluded.

**6.** Absent the defendant's consent, the circumstances are, of course, fundamentally otherwise. *E.g. United States v. Lamb*, 529 F.2d 1153 (9th Cir. 1975).

been deliberating for some length of time was, under the circumstances of this case, *plain* error, I respectfully dissent.

## I.

Although I have no quarrel with the majority's characterization of the facts, I think a more extensive presentation of them is merited here.

Before the jury retired at 1:22 p. m., Nancy Stiles, an alternate juror, was excused. At 2:10 p. m., the trial judge was given a note written by Brian Bamberger, one of the regular jurors. Based upon this communication, the judge had the jury recalled to the courtroom. Shortly thereafter, at 2:14 p. m., the jurors were again excused while the court questioned Bamberger. The other eleven regular jurors were directed not to continue their deliberations.

As a result of his responses to questions from the court, Bamberger was excused. At about that time, the previously discharged alternate, Nancy Stiles, returned to the courtroom and was noticed by the judge. He examined Miss Stiles to determine whether she had been tainted by any contacts outside the courtroom, and satisfied himself that she had not been.

The judge then recalled the eleven remaining regular jurors at 2:58 p. m., added Miss Stiles to the panel, and at 3:00 p. m., the reconstituted jury retired. The judge did not instruct the jury to begin its deliberations anew, nor was such an instruction requested by defense counsel. A guilty verdict was reached at 3:35 p. m.

## II.

It is my contention that the procedure employed here constituted plain error; that contention is buttressed by the rationale of the thirteen juror cases.

Rule 24(c) provides that "[a]n alternate juror who does not replace a regular juror *shall be discharged* after the jury retires to consider its verdict." (emphasis added). Absent a written agreement pursuant to Rule 23(b) that deliberations may proceed with a jury of less than twelve, the mandate of Rule 24(c) is clear that the jury as it retires is the jury that is to return the verdict. There is no provision anywhere in the Rules for substitution of alternate jurors once the deliberative process has begun. The procedure adopted by the court below, and approved by the majority here, is contrary to the letter of the law, and was, in fact, specifically considered and rejected when the Rules were under study.[1]

The rationale of the thirteen juror cases from this Circuit, *United States v. Virginia Erection Corp.*, 335 F.2d 868 (4th Cir. 1978), and *United States v. Chatman*, 584 F.2d 1358 (4th Cir. 1978), supports the argument that substitution of jurors after deliberations have begun is plain error. In *Virginia Erection*, the trial court had allowed an alternate juror to retire to the jury room and remain there during deliberations. Finding this procedure impermissible, this court pointed out that "Rule 24(c) patently makes no provision for the replacement of a juror who becomes disabled after the jury retires to deliberate." 335 F.2d at 871. Judge Boreman's construction of the rule is persuasive:

> rule makers were concerned with establishing procedures whereby the courts could avoid mistrials in protracted cases. The procedure followed in the case at bar, one which had been considered and rejected, was not only contrary to the letter but also the spirit of Rule 24(c).

> *United States v. Virginia Erection Corp.*, 335 F.2d 868, 871 (4th Cir. 1964).

> The American Bar Association Project on Minimum Standards for Criminal Justice also rejected a similar proposal. *See ABA Project on Minimum Standards for Criminal Justice* § 2.7 at 326, Standards Relating to Jury Trial (Approved Draft, 1974).

1. The Committee history leading to the formulation and adoption of Rule 24 discloses that the United States Supreme Court Advisory Committee on Rules of Criminal Procedure seriously considered the possibility of permitting an alternate juror to replace a regular juror who becomes disabled *during* the jury's deliberations but rejected it after the desirability and constitutionality of such a procedure had been questioned by the Supreme Court. [See Orfield, Trial Jurors in Federal Criminal Cases, 29 F.R.D. 43, 46.]

   Rule 24(c) patently makes no provision for the replacement of a juror who becomes disabled after the jury retires to deliberate. The

The obvious purpose of Rule 24(c) is to make adequate advance provision for meeting a situation where a regular juror becomes incapacitated or disqualified and the defendant relies upon his constitutional right to a jury of twelve. The delay and expense necessarily arising as consequences of a mistrial and starting afresh with a new jury are thus avoided.

Rule 24(c) is explicit in defining the function of an alternate juror and the time when his replacement of a disqualified regular juror begins, that is, *prior* to the time when the jury retires to consider its verdict.

. . . . .

It is certain that the alternate [here] had no legal standing as a juror. Rule 24(c) required that he be discharged.

. . . . .

We deem it most unwise to place the judicial stamp of approval upon this attempt of court and counsel to circumvent the established rule and to substitute unauthorized procedures. 335 F.2d at 871–73.

Defense counsel's failure to object, and apparent consent, to the procedure did not insulate it from attack. *Chatman* involved an inadvertent violation of Rule 24(c) when an alternate juror mistakenly remained with the jury during the first part of its deliberations. *Virginia Erection* was held to require a ruling that the presence of the alternate was plain error; again, no objection or motion for mistrial was required.

In an effort to distinguish *Virginia Erection* and *Chatman* from the instant case, the majority emphasizes that there were never in fact thirteen jurors in the jury room at the same time.[2] I agree that this is so, but I am nonetheless persuaded that this case was in reality tried by a jury of thirteen members. The initial deliberations involved Brian Bamberger and the other eleven regular jurors. They remained together for approximately fifty minutes. Then, after Bamberger was replaced by Miss Stiles, the eleven regular jurors and Miss Stiles made up the fact finders. This group deliberated for thirty-five additional minutes. Unlike the cases in which an alternate was in the jury room under instructions to remain mute, it must be assumed that both Bamberger and Miss Stiles, as well as the other eleven regular jurors, discussed the evidence and participated in the jury's deliberations. It cannot be gainsaid that thirteen different individuals did ponder the fate of Evans and contribute to the verdict against him.

It is also, in my opinion, not desirable to allow a juror who is unfamiliar with the prior deliberations to suddenly join the group and participate in the voting without the benefit of the prior group discussion. As the New York court of appeals, in striking down a statute allowing such a substitution, pointed out:

"the alternate juror entered the jury room after the eleven original jurors had sifted the evidence, and in all probability, already formulated their preliminary positions. Most important of all, each of the eleven jurors was aware of the outlooks and positions of the others on the questions presented by the case, and sufficient time had elapsed so that surely the interplay of influences among and between the jurors had come into operation . . . If deliberations had progressed to a stage where the original eleven were in substantial agreement, they were in a position to present a formidable obstacle to the alternate juror's attempts to persuade and convince the eleven remaining original jurors." *People v. Ryan*, 19 N.Y.2d 100, 278 N.Y.S.2d 199, 224 N.E.2d 710 (1966).

In addition, the eleven regular jurors have had the benefit of the views of the original excused juror, which views were not available to the alternate.

---

2.  I readily concede that this case, unlike *Virginia Erection* and its progeny, does not involve issues of jury privacy, at least in the same sense that those cases do. I am, however, unwilling to put "the judicial stamp of approval" on any procedure that is contrary to the language of the law and that was specifically considered and rejected by the Rule writers.

### III.

The majority suggests that Evans here consented to this procedure and thus waived any right he might otherwise have had to object. At least one eminent authority suggests that consent in such a situation will not save the day. Professor Wright states that "it is reversible error, *even though defendant may have consented,* to permit an alternate to stay with the jury after they have retired to deliberate or *to substitute an alternate after deliberations have begun.*" 2 Wright, *Federal Practice and Procedure,* § 388 at 52 (1969) (emphasis added) (footnotes omitted).[3]

Even if consent could cure the error here and give rise to an effective waiver, I am unwilling to find that Evans effectively waived his rights within the meaning of *Patton v. United States,* 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930), which sets forth the criteria for such a waiver of constitutional jury rights. It is true that Evans did personally state that he preferred to add the alternate to the jury rather than to have a mistrial. However, Rule 23(b) of the Federal Rules of Criminal Procedure provides an explicit procedure for avoiding a potential mistrial when a regular juror is unable to continue. The record does not mention any discussion of Rule 23(b). As the majority points out, the parties did stipulate during oral argument that the subject of Rule 23(b) was brought up, but they conceded that it appears most probable that Evans "expressed no conclusion for or against an eleven man jury."

This, to my mind, distinguishes the cases relied upon by my brethren, for in *Henderson v. Lane,* 613 F.2d 175 (7th Cir. 1980), the defendant specifically refused to stipulate to an eleven member jury, and in *United States v. Baccari,* 489 F.2d 274, 275 (10th Cir. 1973) (emphasis added), the opinion states that "*[a]fter discussing various alternatives,* it was agreed by all parties that the alternate juror should be recalled and the deliberations continued." [4]

I am unable to accept the theory that there is a *Patton* waiver when a criminal defendant is never presented with an opportunity to choose among *all* of the available options. First of all, Evans was not called upon to elect between a mistrial and a Rule 23(b) eleven juror trial. Instead, he was told that he would either suffer a mistrial or allow the alternate to replace Bamberger. In short, he was forced to choose between a mistrial and an impermissible procedure without being given an opportunity to consider an avenue expressly made available by the Rules. This to me is neither an informed consent nor a knowing waiver. Without such consent and waiver, the conviction cannot stand. *United States v. Lamb,* 529 F.2d 1153 (9th Cir. 1975).

I re-emphasize, however, that I find the procedure employed here to be plain error, uncurable by consent. *Patton* was decided before the adoption of the Federal Rules of Criminal Procedure and it seems clear that Rules 23 and 24 control the case at hand. *See Virginia Erection Corp., supra,* at 870–71.

### IV.

There is a superficial appeal to almost any scheme that would enable a trial judge to prevent a second trial in a protracted lawsuit when a juror becomes incapacitated

---

**3.** Elsewhere, Professors Wright and Miller note that "[t]he rule permits an alternate juror to replace a regular juror *only* prior to the time the jury retires to consider its verdict. It provides, *in mandatory language,* that an alternate juror who has not replaced a regular juror 'shall be discharged' when the jury retires." 9 Wright & Miller, *Federal Practice and Procedure,* § 2484 at 477 (1971) (emphasis added) (footnote omitted).

**4.** The opinion in *Baccari* reveals that the trial judge made an affidavit concerning a conference which was not a part of the record. A review of this affidavit obtained from the Tenth Circuit shows that the judge asserted, in part that "[a]fter a brief discussion, both defendants, personally, and both defense counsel stated that they did not want a mistrial declared *and did not want to continue with eleven jurors.*" (emphasis added). This demonstrates that the defendants considered and rejected the Rule 23(b) option.

after jury deliberations have begun.[5] However, I am unwilling to uphold the procedure employed in this case. If we enforce the rules as written, trial judges have clear and explicit guides to follow. If we permit deviations from the Rules, where do we stop? How many alternate jurors can be added to a panel? Under what circumstances and at what stage in the deliberations must the substitutions cease?

Therefore, although I concur in the majority's handling of the evidentiary questions, I cannot agree with its affirmance based on the jury constitution issue.

For these reasons, I dissent and would award a new trial.

**5.** It should be noted here that this was not a protracted trial, but one that lasted for only one and one-half days. Hence, this is not a case where considerations of judicial economy have any substantial relevance.