EL PUEBLO DE PUERTO RICO, apelado, *v.* MANUEL MENDOZA LOZADA, acusado y apelante.

*Número:* CR-86-47    *Resuelto:* 13 de abril de 1988

*Sylvia Juarbe* y *Cándida Valdespino Zapata*, abogadas del apelante; *Norma Cotti Cruz, Subprocuradora General, Nilda P. Fuentes Ortiz, Procuradora General Auxiliar*, abogadas de El Pueblo.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Mediante veredicto por mayoría de 9 a 3, un jurado de Carolina halló culpable al apelante de los delitos de asesinato en primer grado y varias violaciones a la Ley de Armas de

Puerto Rico. El Tribunal Superior dictó las sentencias de rigor y el convicto presentó oportunamente escrito de apelación en el que cuestiona básicamente la suficiencia de la prueba para establecer su culpabilidad más allá de duda razonable, así como la negativa del tribunal a admitir la declaración de un testigo no disponible por constituir prueba de referencia. Resolvemos que, aunque el tribunal cometió error al excluir la prueba de defensa, debe confirmarse la sentencia apelada.

I

Como prueba de cargo el fiscal presentó al testigo ocular Daniel González Ramos, al doctor Criado, quien estuvo a cargo de la autopsia, y al policía que investigó los hechos.

El testigo González Ramos, adicto a la heroína y a la cocaína para la fecha de los hechos, declaró que el 3 de junio de 1983 se encontraba en el Residencial Covadonga en la esquina del edificio 14, lugar conocido entre los adictos como "el punto". Relató que siempre iba a "el punto" en espera de que "cayeran par de pesos para curarse". La prueba creída por el jurado demostró que a eso de las 9:00 A.M. llegó Samuel Rosario Feliciano conocido por "Papi Sammy", a quien el testigo conocía como un vendedor de drogas. Estacionó su vehículo frente al edificio 20 del residencial, conversó unos minutos con otras personas y luego caminó hasta el edificio 14.

El testigo se percató que por la acera del edificio 20 venían armados Daniel González Algarín, conocido por "Algarín", y el acusado Manuel Mendoza, a quien también conocía desde hace diez años. En una rápida secuencia de hechos, éstos ultimaron a balazos a Samuel Rosario.

En su alegato, la Sociedad para Asistencia Legal pone gran énfasis en las contradicciones o equivocaciones secundarias en el testimonio de Daniel González, entre otras, si Samuel Rosario ya estaba o no dentro del vehículo al ini-

ciarse los disparos, o si éste cayó "mirando al cielo" o boca abajo, teoría compatible con las abrasiones que luego aparecieron en la cara del occiso.

Sonia Hernández Rivera fue la principal testigo de defensa. Conocía al occiso. El día de los hechos su mamá la levantó como a las 8:30 A.M. Fue a hacer un encargo y de regreso encontró a "Papi Sammy" cerca de la esquina del edificio 14. Se saludaron y Sonia subió a su casa. Oyó el ruido de un carro y miró por la ventana. Vio que la víctima se montaba en su automóvil por el lado del pasajero en busca de algo. En eso llegó "Algarín" quien también se montó en el carro por el lado del conductor. Ya dentro del carro abrió fuego. Samuel Rosario trató de escapar y recibió nuevos disparos. Cayó de bruces y "Algarín" corrió en dirección al monte.

La defensa alega que este testimonio corresponde con el hallazgo en la autopsia. El doctor Criado declaró que la herida que ocasionó la muerte de Rosario Feliciano mostraba los caracteres de entrada de una bala en "tiro intermedio (a unas veinte pulgadas)" de contorno circular y bordes invertidos, localizada en la línea axilar posterior izquierda de la espalda. La bala penetró el abdomen donde originó una laceración del lóbulo izquierdo del hígado, produjo la contusión del borde inferior del pulmón izquierdo y una lesión del saco pericárdico, lo que originó una severa hemorragia y la muerte. A base de estos hallazgos opinó que Samuel Rosario debió estar quieto cuando recibió los impactos de bala "entre diecinueve (19) y veinte (20) pulgadas de distancia".

■ El testimonio del patólogo, aunque auxiliador, no obligaba al jurado. Éste hizo su propia apreciación de lo acontecido. Sobre los hechos en controversia desfiló prueba de cargo y descargo. El Ministerio Público presentó a un testigo ocular que, aunque adicto, no demostró que al momento de los hechos estuviese tan alterado que no pudiese o

quisiese observar diligentemente. Sus cualidades o dotes morales pueden afectar la credibilidad de su testimonio, pero no destruirlo como instrumento evidenciario. Aunque conforme a los hechos de este caso el tribunal de instancia no estaba obligado a transmitir instrucciones especiales en cuanto al peso o credibilidad del testimonio de Daniel González Ramos, de la exposición narrativa se desprende que en efecto se impartieron instrucciones en el sentido de que "su testimonio debe ser examinado con desconfianza". Obviamente, el jurado le dio el peso y credibilidad que merecía, luego de examinarlo con cautela a la luz de toda la evidencia presentada en el caso.

La teoría de defensa, por su parte, consistió en que "Algarín" fue el que disparó y que el apelante no se encontraba en el lugar de los hechos ese día. La prueba en este sentido fue conflictiva, pero dicho conflicto fue dirimido por el jurado. Fue suficiente para establecer la comisión de los delitos. El testimonio de Daniel González no fue inverosímil o físicamente imposible. Por el contrario, está en parte corroborado extensamente por la prueba de defensa. Entre otros, por el testigo Esteban Rivera Benítez, quien observó a "Algarín" disparar a una distancia de unos "nueve pies" (E.N.P., pág. 32) y no dentro del automóvil.

En estas circunstancias, no intervendremos con la apreciación y adjudicación de credibilidad que de la prueba testifical hizo el juzgador de los hechos en instancia. Un examen sereno, detallado y desapasionado de la prueba no produce en nuestro ánimo insatisfacción o intranquilidad de conciencia. *Pueblo* v. *Cabán Torres*, 117 D.P.R. 645 (1986); *Pueblo* v. *Millán Meléndez*, 110 D.P.R. 171 (1980); *Pueblo* v. *López Pérez*, 106 D.P.R. 584 (1977); *Pueblo* v. *Borrero Robles*, 113 D.P.R. 387 (1982).

## II

Se señala como segundo error que el tribunal a quo no permitió "las declaraciones anteriores de un testigo de defensa no disponible para declarar", al amparo de la Regla 64(A)(4) y (B)(3) de Evidencia, 32 L.P.R.A. Ap. IV.

La prueba de referencia en este caso alude a la declaración de una persona que había fallecido[1] para la fecha del juicio. La defensa presentó como testigo a la hija de la persona fallecida para que declarara sobre unas manifestaciones extrajudiciales que escuchó de su madre minutos después de los hechos. En la actualidad la testigo está casada con un hermano materno del acusado.

El fiscal se opuso a aceptar que declarara la hija, y el tribunal, en ausencia del jurado, escuchó el testimonio así como los argumentos de ambas partes. Declaró con lugar la objeción del fiscal, pero permitió una oferta de prueba. De ella se desprende que la testigo hubiese declarado que el día de los hechos su madre le dijo que había estado discutiendo con la víctima por la ventana de su apartamento, ya que éste la acusaba de ser "chota". En eso llegó "Algarín" y ella buscó un revólver para matar a Samuel Rosario. "Algarín" se lo quitó y persiguió a la víctima con el resultado que conocemos. Terminado el sangriento incidente, "Algarín" le pidió heroína a la madre de la testigo, pues ella vendía la droga.

La Sociedad para Asistencia Legal argumenta que el tribunal debió permitir que la testigo declarara ante el jurado en torno a la conversación que tuvo con su madre, ya que la declaración de la persona fallecida era admisible en evidencia por ser contra interés, y la sometía al riesgo de responsabilidad por encubrir un crimen, además de exponerla al odio, ridículo o desgracia social. Según la defensa, dicha declaración constituía prueba circunstancial de la no participación del apelante en los hechos.

---

[1] Hecho que no puso en duda el fiscal en el juicio ni el Procurador ante nos.

Hemos examinado el planteamiento de error y coincidimos con que se cometió, pero el mismo no fue un factor decisivo y sustancial en la convicción cuya revocación se solicita. Veamos:

Dispone la Regla 64(A)(4) de Evidencia, *supra*:

(A) *Definición*. "No disponible como testigo" incluye situaciones en que el declarante:

. . . . . . . . .

(4) ha fallecido o está imposibilitado de comparecer a declarar por razón de enfermedad o impedimento mental o físico, o . . . .

Por su parte la Regla 64(B)(3) de Evidencia, *supra*, expresa:

(B) Cuando el declarante no está disponible como testigo, es admisible como excepción a la regla de prueba de referencia:

. . . . . . . . .

(3) *Declaraciones contra interés*: Una declaración que al momento de ser hecha era tan contraria al interés pecuniario o propietario del declarante o le sometía al riesgo de responsabilidad civil o criminal, o tendía de tal modo a desvirtuar una reclamación suya contra otro, o creaba tal riesgo de convertirlo en objeto de odio, ridículo o desgracia social en la comunidad, que un hombre razonable en su situación no hubiera hecho la declaración a menos que la creyera cierta.

La regla actual expande significativamente el alcance de la norma tradicional que limitaba la declaración contra interés al interés propietario o pecuniario. Ahora se reconoce también el interés civil y el penal. La Regla 804(b)(3) de Evidencia federal, 28 U.S.C., no alcanza el interés civil. La nuestra va más lejos y sí lo incluye.[2] Se reco-

---

[2] Véanse: D.A. Furlow, *Sin, Suffering, and "Social Interest": A Hearsay Exception for Statements Subjecting the Hearsay Declarant to "Hatred, Ridicule, or Disgrace"*, 4 Rev. of Litigation 367–452 (1985); D.A. Furlow, Pennington,

noce, como principio, que nadie hace declaraciones contra su propio interés a menos que creyere que lo declarado es verdad. "Aquí la premisa es la garantía circunstancial de veracidad ya que la gente no hace declaraciones falsas que lesionen sus intereses." Comentario oficial a la Regla 64(B)(3), L.P.R.A., Título 32, Reglas, ed. 1983, pág. 439; B.S. Jefferson, *Declarations Against Interest: An Exception to the Hearsay Rule*, 58 Harv. L. Rev. 1 (1944); E.M. Morgan, *Declarations Against Interest*, 5 Vand. L. Rev. 451 (1952); Nota, *Declarations Against Penal Interest: Standards of Admissibility Under an Emerging Majority Rule*, 56 B.U.L. Rev. 148 (1976); P.W. Tague, *Perils of the Rulemaking Process: The Development, Application, and Unconstitutionality of Rule 804(b)(3)'s Penal Interest Exception*, 69 Geo. L.J. 851 (1981); 4 *Louisell & Mueller, Federal Evidence* Sec. 489, pág. 1128 (1980); L.C. Graham, *Handbook of Federal Evidence*, 2da ed., West Pub. Co., 1986, Sec. 804.3, pág. 958 *et seq.*; S.A. Saltzburg y K.R. Redden, *Federal Rules of Evidence Manual*, 3ra ed., Virginia, The Michie Co., 1982, pág. 659 *et seq.*

■ La admisibilidad de declaraciones contra interés penal *como prueba de defensa* puede adquirir dimensiones constitucionales. Así lo reconoció el Tribunal Supremo federal en *Chambers* v. *Mississippi*, 410 U.S. 284 (1973), donde se invocó el debido proceso de ley como fundamento para la admisión de una confesión de un tercero que constituía prueba de defensa exculpatoria.

■ Nuestro sistema de enjuiciamiento criminal está apuntalado en un principio que favorece la presunción de

---

*Determining What Types of Hearsay Disparage a Declarant's "Social Interest": An Innovation for Texas Evidence Law*, 48 Tex. B.J. 1058 (1985); 4 *Weinstein on Evidence* Sec. 804(b)(3)[01], págs. 804-123, 804-124 (Supp. 1988); Mont. Rev. Codes Ann. Sec. 93-3002 (1947); Ark. Stat. Ann. Sec. 28-1001 (1947); N.D.R. Evid. Sec. 804(b)(3) (1987 Suppl.); Wisc. Stat. Ann. Sec. 908.045(4) (1975).

inocencia y las oportunidades de defensa. Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1; Regla 110 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. A tenor con las normas probatorias pertinentes y aplicables al caso ante nos, en *Pueblo* v. *Mangual Hernández*, 111 D.P.R. 136, 143–145 (1981), el tribunal sentenciador excluyó una declaración jurada prestada por una persona que no estaba disponible para testificar en el juicio por hallarse mentalmente incapacitada. En la misma el declarante admitía haber participado en el crimen e involucraba a otras personas, pero no al acusado-apelante. Revocamos y favorecimos su admisibilidad bajo la Regla 64(B)(3) de Evidencia, *supra*.

No cabe duda de que estamos ante una materia compleja sobre la que los juristas más informados en la disciplina probatoria han intentado fórmulas conciliadoras. La recta solución del recurso exige que expongamos los principios generales.

■ Los requisitos de aplicación de la regla son tres en esencia. Primeramente, la no disponibilidad del declarante; segundo, el conocimiento personal, exigencia que aunque no surge del texto de la regla es favorecida por el grueso de la doctrina. Como variante, contémplase que el declarante tenga una comprensión del carácter perjudicial de la declaración al momento de hacerla. Nótese que las manifestaciones de una *parte*, aunque no estén fundadas en el conocimiento personal y sean en la forma de opiniones o inferencias, son en principio admisibles contra dicha parte bajo la Regla 62 de Evidencia, 32 L.P.R.A. Ap. IV, circunstancia que distingue uno y otro precepto probatorio. Tague, *op. cit.*, pág. 919; A.B.A. Section of Litigation, *Emerging Problems Under the Federal Rules of Evidence*, págs. 243–244 n. 203 (1983). Por último, y como tercer requisito, la declaración, en efecto, debe ser contra interés.

■ El primero de los requisitos —no disponibilidad— no presenta mayores problemas. Es el resultado de la ubicación de la norma en la Regla 64 y no en la Regla 65 de Evidencia, *supra*. Dicha condición provee la tradicional justificación en términos de *necesidad*, circunstancia que permea todo análisis de prueba de referencia. El hecho de la no disponibilidad no está en controversia en el presente caso.

■ El segundo requisito —conocimiento personal y entendimiento de la naturaleza "contra interés" de la declaración— tiene que ser analizado a la luz de todas las circunstancias del caso. Ya que la regla sólo puede ser invocada por definición cuando el declarante no está disponible, ésta sólo exige una demostración de que dicho declarante "probablemente" sabía sobre lo que declaraba. Louisell & Mueller, *supra*, Sec. 489, pág. 1131. Por idéntica razón de ausencia y por la imposibilidad probatoria y vital de penetrar en la conciencia de los semejantes, el requisito de que el declarante tenga una comprensión del carácter perjudicial de la manifestación se formula en términos *objetivos*: ¿Hubiere hecho un hombre razonable en la misma situación la declaración, a menos que la creyera cierta?

■ En el caso de autos, de las declaraciones de la persona fallecida surge tal conocimiento personal. Es decir, por un lado, su propia participación en actividades ilícitas constituye una declaración que, de ser ofrecida contra una parte por el oponente, sería admisible de forma análoga por constituir una admisión. *United States* v. *Barrett*, 539 F.2d 244, 251 (1er Cir. 1976); *United States* v. *Garris*, 616 F.2d 626, 630 (2do Cir. 1980); *United States* v. *Thomas*, 571 F.2d 285, 288–289 (5to Cir. 1978); *United States* v. *Toney,* 599 F.2d 787, 789–790 (6to Cir. 1979). No hay en el récord prueba de que la declarante estuviese falseando en cuanto a estos extremos. Todo lo contrario, la prueba demostró que los trágicos prota-

gonistas de este incidente vivían en un ambiente fatalmente al margen de la ley. Por otro lado, el exabrupto homicida de "Algarín" fue percibido directamente por la madre de la testigo y las propias observaciones de ésta, consumados ya los hechos, tienden a corroborar este aspecto de la declaración.

■ Valga aclarar que la regla no exige conocimiento personal sobre todos y cada uno de los asuntos que dan lugar a una acusación criminal. El elemento "contra interés" en este caso no está predicado en la participación directa de la declarante en el asesinato. No era necesario que ésta presenciara ese hecho sin duda central en el caso. Basta decir que su declaración satisfacía el requisito de pertinencia de la Regla 18 de Evidencia, 32 L.P.R.A. Ap. IV, pues tendía "a hacer la existencia de un hecho más probable o menos probable de lo que sería sin tal evidencia . . .". Este hecho se refería a una cuestión igualmente central en controversia: la participación del apelante en el asesinato. Después de todo, toda definición de pertinencia se hace a base de criterios de probabilidad y dicha prueba constituía un eslabón circunstancial en la teoría de descargo.

El tercer interrogante nos lleva a la médula del asunto: ¿Era la declaración en este caso contra interés? En el presente recurso la cuestión se manifiesta en términos clásicos.

En efecto, a menudo una declaración es en parte contra interés y a la vez a favor del declarante (*self-serving*). El problema en esos casos consiste en determinar cuál es el elemento que predomina. Morgan, *supra*, págs. 451, 471, 478.

Podría argumentarse que la prueba en este caso surge con esa cualidad mixta. Si bien por un lado es cierto que en su contexto involucraba a la declarante en actividades ilícitas como la venta de drogas, violaciones a la ley de armas y posible responsabilidad criminal como encubridora de un asesinato, existía en el plano hipotético un motivo para falsear.

■ Aunque no hay prueba directa de incitación, es posible especular que "Algarín" asesinó a Samuel Rosario *por encargo* de la declarante y a cambio de la droga. Semejantes inquietudes son válidas. No podemos, sin embargo, descansar en una apreciación de móviles impulsores sin fundamento alguno en el récord. Aun si aceptáramos que el tribunal a quo estaba justificado en mirar con escepticismo la declaración, lo cierto es que la prueba era de su faz admisible. Ausente un problema de admisibilidad, el tribunal debió dejar que pasara la prueba al jurado para que éste evaluara su peso probatorio a la luz de la totalidad de la prueba. Al no hacerlo usurpó las funciones del jurado. Regla 9 de Evidencia, 32 L.P.R.A. Ap. IV.

Bajo la lógica probatoria más adversa al apelante estamos ante una declaración que, más allá de las sutilezas doctrinales, en su contexto amenazaba de forma *objetiva*, directa y palpable los intereses de la declarante. Los delitos a los que la exponía su conducta no eran remotos o hipotéticos. Se trataba de ofensas cuya gravedad conoce todo ciudadano en Puerto Rico. Las manifestaciones se produjeron de forma espontánea a escasos minutos del asesinato. No estamos ante el tipo de declaración donde impera el elemento de propio beneficio que derrota todo indicio de confiabilidad. Véanse: Louisell & Mueller, *supra*, Sec. 489, pág. 1156; *United States* v. *Callahan*, 442 F. Supp. 1213, 1222 (Minn. 1978); *United States* v. *Trejo-Zambrano*, 582 F.2d 460, 463–464, *cert.* denegado 439 U.S. 1005 (1978); *United States* v. *Marquez*, 462 F.2d 893, 895 (2do Cir. 1972); *United States* v. *Seyfried*, 435 F.2d 696, 697–698, *cert.* denegado 402 U.S. 912 (1971); Graham, *op. cit.*, pág. 965 n. 8.

■ Argumenta el Procurador que una declaración de una madre a una hija no puede considerarse contra el interés penal de la primera, ya que no existía la posibilidad de que la testigo acusara a su madre dada la relación familiar

y la atmósfera de intriga y confabulación criminal que impera en el bajo mundo. No tiene razón. La identidad de la persona a quien se hace la declaración es uno entre otros factores. Aun cuando podamos inferir que la testigo tenía conocimiento de las actividades ilegales de su madre, precisamente, el reconocimiento de una actividad criminal de ordinario se hace ante amigos o gente en la que el declarante confía. E.L. Chiesa, *Práctica Procesal Puertorriqueña, Evidencia*, San Juan, Pubs. J.T.S., 1985, Vol. I, pág. 356. Véanse, también: *United States* v. *Goins*, 593 F.2d 88, 91 (8vo Cir. 1979) (una persona le dijo a su hija y a un amigo que había mentido ante un gran jurado, lo que constituía delito); *United States* v. *Mock*, 640 F.2d 629, 631–632 (5to Cir. 1981) (declaraciones inculpatorias a la ex esposa del declarante); *United States* v. *Lang*, 589 F.2d 92, 97 (2do Cir. 1978). Bajo un enfoque más realista y lógico, la estrecha relación entre la declarante y la testigo tiende a asegurar el elemento de confiabilidad. *Chambers* v. *Mississippi*, supra, pág. 300. Por último, aunque nuestra regla —distinto a la federal— no exige *corroboración* cuando la declaración tiende a exculpar al acusado, en el caso de autos hubo abundante prueba directa de corroboración de la participación de "Algarín" en los incidentes.

■ Ahora bien, bajo los hechos del presente caso, y admitido el error, ¿acarrea revocación? En modo alguno. El Tribunal Superior permitió la oferta de prueba y obra en la exposición narrativa. Estamos en condiciones de determinar el efecto de su errónea exclusión al amparo de la Regla 5(2) de Evidencia, 32 L.P.R.A. Ap. IV.[3]

---

[3] *"Regla 5. Efecto de error en la exclusión de evidencia*

"No se dejará sin efecto una determinación de exclusión de evidencia ni se

Por supuesto, no estamos ante la situación de una declaración que exculpa o exime totalmente de responsabilidad criminal. Por el contrario, la declaración objeto de la controversia sólo pretendía establecer que "Algarín" salió de la casa con un arma. No excluye ni descarta la participación o coautoría del apelante. La prueba a lo sumo, de ser creída, demostraba que la madre de la testigo tenía conocimiento personal de que "Algarín" participó en el tiroteo. Resulta evidente que en el caso que nos ocupa el resultado no hubiera sido distinto en términos de probabilidades.

Como materia de suficiencia, la prueba de cargo presentada a los fines de establecer la responsabilidad del apelante descansó en la *evidencia directa* de un testigo presencial. Aunque la defensa presentó dos testigos que alegadamente también presenciaron los hechos, no merecieron credibilidad al jurado. El testimonio excluido sólo hubiera corroborado al testigo de cargo que ubicó a "Algarín" en el lugar de los hechos sin ser inconsistente, repetimos, con la prueba de cargo.

Finalmente, el jurado fue instruido en el sentido de que el Ministerio Fiscal utilizó a un testigo de cargo a quien se le otorgaron ciertos beneficios en relación con un caso de escalamiento que tenía pendiente a cambio de su testimonio. El jurado analizó cuidadosamente la prueba sometida y rindió su veredicto conforme a derecho. Su dictamen debe prevalecer.

*Se dictará sentencia que confirme la del Tribunal Superior, Sala de Carolina.*

---

revocará sentencia o decisión alguna por motivo de exclusión errónea de evidencia a menos que,

"(1) La evidencia fue erróneamente excluida a pesar de que la naturaleza, propósito y pertinencia de la misma fue traída a la atención del tribunal mediante una oferta de prueba o por cualquier otro modo, y

"(2) el tribunal que considera el efecto de la exclusión errónea entiende que ésta fue factor decisivo o sustancial en la sentencia o decisión cuya revocación se solicita." 32 L.P.R.A. Ap. IV, R. 5.

El Juez Presidente Señor Pons Núñez concurrió con el resultado sin opinión escrita. El Juez Asociado Señor Negrón García emitió voto concurrente. El Juez Asociado Señor Rebollo López concurrió sin opinión escrita.

—O—

Opinión concurrente del Juez Asociado Señor Negrón García.

Concurrimos con la opinión confirmatoria de la sentencia del Tribunal Superior, Sala de Carolina. La prueba desfilada sostiene ampliamente los veredictos de culpabilidad respecto al asesinato de Samuel Rosario Feliciano, c/p "Papi Sammy", por el apelante Manuel Mendoza Lozada conjuntamente con Daniel González Algarín, c/p "Algarín", el 3 de junio de 1983 en el Residencial Covadonga.

Ahora bien, discrepamos del análisis y conclusión de que el tribunal sentenciador erró al excluir una parte del testimonio de Mary Rodríguez, testigo presentada por el acusado Mendoza Lozada para probar unas manifestaciones que alegadamente escuchó de su madre Lidia Rodríguez Ortiz, fallecida al momento del juicio. Esa conclusión se apoya en la premisa de que dicho testimonio era admisible bajo la Regla 64(B)(3) de Evidencia, 32 L.P.R.A. Ap. IV, por corresponder a una testigo no disponible y versar sobre una declaración contra interés que la exponía al riesgo de responsabilidad criminal.

I

La Regla 64(B)(3) de Evidencia, *supra*, autoriza —como excepción a la regla de prueba de referencia si el declarante no está disponible como testigo— la admisibilidad de declaraciones contra interés. Dispone:

Una declaración que al momento de ser hecha era tan contraria al interés pecuniario o propietario del declarante o le

*sometía al riesgo de responsabilidad* civil o *criminal*, o tendía de tal modo a desvirtuar una reclamación suya contra otro, *o creaba tal riesgo de convertirlo en objeto de odio, ridículo o desgracia social en la comunidad, que un hombre razonable en su situación no hubiera hecho la declaración a menos que la creyera cierta.* (Énfasis nuestro.)

Lo primero que debemos recordar es que, aparte de la indisponibilidad del testigo, es menester *su conocimiento personal y directo* de los hechos que se intentan reproducir por voz de otro y la percepción y creencia —bajo la figura mítica de persona prudente y razonable— de que las mismas eran contrarias al interés del interlocutor —ausente del tribunal— de que lo exponían a riesgo de sanción criminal o al desprecio público en la comunidad, al extremo que de no ser veraces no las hubiera hecho. Ambos requisitos, el del conocimiento personal y el de la percepción contra interés, son *inherentes* en toda declaración de este tipo. 4 *Weinstein on Evidence* 804-130 (1985).

Este mismo estudioso de la materia nos dice que la excepción a la prueba de referencia "descansa en la premisa de que las personas no harían manifestaciones dañinas en su contra a menos que fueran ciertas. Como una generalidad psicológica, esta conclusión suena correcta; en el caso individual, la diversidad de la personalidad humana hace las generalidades sospechosas. No obstante las consecuencias que contra ellas pudiera acarrear, *algunas personas dirán mentiras* para *exonerar* o inculpar aquellos a quienes *aman o temen*, o porque son metirosos congénitos. *Otros no se darán cuenta de que están haciendo una admisión en su contra o harán manifestaciones ambivalentes susceptibles de ser diferentemente interpretadas*". (Traducción y énfasis nuestro.) Weinstein, *supra*, pág. 804-123.

La confiabilidad de tales declaraciones extrajudiciales —a base de las circunstancias peculiares presentes en cada caso— debe ser cuidadosa y preliminarmente examinada por

el juez, aunque no a un grado absoluto, pues estaría invadiendo la función del jurado de pesar y adjudicar la credibilidad. *State* v. *Gold*, 431 A.2d 501, 508, *cert.* denegado, 449 U.S. 920 (1980). *Ningún factor por sí solo es determinante. Descansa en el discernimiento informado del tribunal a base de todas las circunstancias.* Ciertamente desde este Foro apelativo, un simple récord inexpresivo nos obliga a ser sumamente cuidadosos y, por ende, a conceder amplia deferencia a esa apreciación preliminar de los tribunales de instancia. Después de todo, no podemos —ni debemos— trasladar nuestros estrados a los foros de origen.

El contenido de ciertas manifestaciones puede ser dual, a saber, constituir en parte *contra interés* y otras en beneficio propio, esto es, *exculpatorias*. La cuestión ha sido objeto de intenso debate. Sin embargo, se acepta sin discusión que dada la fluidez y complejidades de la conducta humana, existen esos dos tipos de declaraciones contra interés: inculpatorias y exculpatorias. La primera es la que compromete al *declarante* y al *acusado* en actividad criminal y se admite contra éste en evidencia. Las *exculpatorias* son declaraciones contra el interés del declarante que indican que el acusado *no es responsable del crimen imputado.* Véase Comentario, *Federal Rule of Evidence 804(b)(3) and Inculpatory Statements Against Penal Interest*, 66 Calif. L. Rev. 1189, 1190 n. 7 (1978); Weinstein, *supra*, págs. 804-96, 804-97; Comentario, *Declarations Against Interest—Rules of Admissibility*, 62 Nw. U.L. Rev. 934, 944–954 (1968). Se aduce que las netamente inculpatorias son más confiables, pues "[h]ay menos peligros envueltos cuando la manifestación inculpatoria no incrimina *directamente* al acusado en el mismo crimen en que el declarante participó". (Traducción nuestra.) Weinstein, *supra*, pág. 804-156.

A su vez, ambas declaraciones —inculpatorias y exculpatorias— son susceptibles de dividirse en *colaterales y no colaterales*. En la colateral —que es la más común— el

contenido inculpatorio no aparece en la porción de la manifestación directamente contra el interés del declarante, *sino en otra porción de su manifestación*. En la *no colateral*, el dato inculpatorio contra el acusado se encuentra en la porción de la manifestación *directa contra el interés del declarante*. *Federal Rule of Evidence 804(b)(3), op. cit.*, págs. 1201–1203.

Ante declaraciones inculpatorias y exculpatorias, no existe unanimidad entre los comentaristas y tribunales sobre cuál es el mejor curso de acción procesal evidenciario. Weinstein, *supra*, págs. 804-136 a 804-138. Wigmore estima que debe ser admitida en su totalidad. 5 *Wigmore on Evidence* Sec. 1465, pág. 339 (Chadbourn rev. 1974). McCormick en su obra *McCormick on Evidence* Sec. 279, pág. 677 (2da ed. 1972) —bajo el razonamiento de que unas manifestaciones en beneficio propio no pueden por definición ser contra interés— sugiere, si es posible, que sólo se admita la porción incriminatoria y se excluya la de beneficio propio. Bajo este enfoque, si las manifestaciones beneficiosas e incriminatorias están inextricablemente unidas entre sí, *se considera más prudente admitir toda la declaración y dejar al juzgador de los hechos evaluar su calidad evidenciaria y probatoria a base del contenido integral*. Sobre el particular, Weinstein informa la tendencia de que los "tribunales están evaluando la declaración como un todo (*as a whole*) para determinar si la razón de ser de la excepción [suficiente garantía circunstancial de veracidad] se satisface". (Traducción nuestra.) Weinstein, *supra*, pág. 804-138.

## II

Ante nos, el apelante Mendoza Lozada específicamente argumenta que la parte de la declaración no admitida era contra interés, pues exponía a la persona fenecida "al riesgo de responsabilidad por *encubrir* un crimen. También le creaba el riesgo de que esa declaración la *convirtiera* en objeto

de odio, ridículo o desgracia social en la comunidad. Así también se exponía a la muerte de parte de Algarín si intentaba revelar el crimen. Un hombre prudente y razonable no hubiera hecho la declaración a menos que la creyera cierta". (Énfasis del original.) Alegato del apelante, pág. 39.

La cuestión exige una referencia *completa al contenido del testimonio de la testigo Mary Rodríguez*, con especial énfasis en la parte *no admitida*. Dejar de hacerlo no es buena metodología adjudicativa judicial. Nos exponemos al riesgo de plasmar correctamente los principios de derechos generales, pero a errar en su aplicación. Veamos.

En esencia la testigo Rodríguez testificó que su madre Lidia, fallecida el 10 de octubre de 1983, la mandó a buscar el día del crimen con una amiga de nombre Vanessa. Ésta le informó que habían matado a "Papi Sammy". Ella fue y lo vio muerto. Luego fue al apartamento y *le preguntó* a su mamá qué había pasado y ella le dijo:

> ... "Yo estaba discutiendo con Sammy por la ventana. Llegó Algarín y me dijo: Mai, ¿Qué pasa? (Algarin le dijo así a mi mamá porque él siempre le decía 'Mai') y mi mamá le contestó a Algarín: 'Que este cabrón (refiriéndose a Papi Sammy) dijo que soy Chota'. Entonces, *ella* se metió para el cuarto y *buscó el revólver porque ella lo iba a matar*. Que cuando salió del cuarto y venía ya por la sala *Algarín dio la vuelta y le quitó el revólver y se fue detrás de Sammy y lo mató*." (Énfasis suplido.) E.N.P., pág. 37.

El texto transcrito corresponde a la porción del testimonio que el foro sentenciador estimó inadmisible, esto es, no se reprodujo ante el jurado.

Luego, la testigo *en presencia del jurado* continuó exponiendo que llegó al apartamento de su madre entre las 9:45 y 10:00 A.M. Su mamá estaba sola. Al rato llegó "Algarín" *y le pidió droga a su mamá porque* era adicto y *había matado a "Sammy"*. E.N.P., pág. 38. *Su mamá vendía drogas*. E.N.P., pág. 38. Declaró que Algarín, en presencia de su madre, le

dijo que lo había matado "'pa que no jodiera más a tu Mai'".
E.N.P., pág. 39.

Posteriormente se marchó. Mientras iba en un auto en el
Expreso de Trujillo Alto, entre la 1:30 y 2:00 P.M., vio al acu-
sado Mendoza Lozada en otro vehículo y le informó que ha-
bían matado a "Papi Sammy". Aquél se mostró sorprendido.
E.N.P., pág. 39. Aceptó que estaba casada con un hermano
materno del acusado Mendoza Lozada, y que nunca informó
de estos hechos a la Policía y sólo al acusado y a su madre de
crianza doña Esperanza. E.N.P., pág. 42.

### III

Aunque en apariencia las manifestaciones de la madre de
la testigo Rodríguez son contra interés, a poco reflexionemos
notamos todo lo contrario: las mismas más bien eran para su
propio beneficio y exculpatorias. Veamos.

De entrada, hemos de aclarar que si bien la condición de
hija de la recipiente de la declaración no derrota su admisibi-
lidad, ello es un factor importante a ser examinado. Después
de todo es a los familiares, confidentes y allegados a quienes
de ordinario se hace este tipo de expresión íntima. *United
States* v. *Goins*, 593 F.2d 88, 91 (8vo Cir.), *cert.* denegado, 444
U.S. 827 (1979); *State* v. *Bryant*, 523 A.2d 451 (Conn. 1987).
En este sentido, es claro que la referencia a la venta de
drogas *no era noticia nueva* para su hija, la testigo Rodrí-
guez. Como cuestión de hecho, *ante el jurado*, ella atestiguó
que su madre biológica se dedicaba a dicha actividad ilegal.
No cabe, pues, argumentar que ese dato de la declaración
extrajudicial de su progenitora —frente a su hija— la expo-
nía a una sanción penal o social. Ciertamente ésta ya tenía
conocimiento de ese tipo de actividad criminosa. En estas
circunstancias, según dispone la Regla 64(B)(3) de Eviden-
cia, *supra*, ¿puede sostenerse que la interlocutora percibió
que tales manifestaciones la sometían al riesgo de responsa-
bilidad criminal o de convertirla en objeto de odio, ridículo o

desgracia social en la comunidad? En sana lógica la respuesta es negativa. *No concurre la condición necesaria de que la declaración contra interés fuera percibida como adversa a la declarante al momento de hacerla.*

Hemos explorado los otros extremos de la declaración excluida con relación a la violación a la Ley de Armas de Puerto Rico y una posible acusación como coautora del asesinato a base de que la declarante fue a buscar un revolver para matar a "Papi Sammy", pero "Algarín" se lo "quitó". Estas manifestaciones van más allá del ámbito de lo especulativo, según sugiere la opinión del Tribunal. Forman parte de la declaración integral y ponen de manifiesto que fueron principalmente hechas a favor —y no en contra— del interés de la declarante no disponible, Rodríguez Ortiz, madre de la testigo. Salvo la posible violación por posesión ilegal de un arma de fuego, las mismas eran favorables y de naturaleza *exculpatoria.* Inculpaban a "Algarín", pues le imputaban haberle *quitado* a ella el revólver y haber realizado por su cuenta el crimen. No existe proporcionalidad entre el riesgo de ser acusado de asesinato y el de posesión ilegal de arma de fuego. La declaración en lugar de incriminarla, la exoneraba del delito más grave: asesinato. Como señala el profesor Chiesa, "[p]uede ocurrir que una declaración contra interés penal tenga por objeto aceptar responsabilidad por un delito menor al imputado. En tal caso las circunstancias que rodean la declaración no apu[n]tan hacia su confiabilidad". E.L. Chiesa, *Práctica Procesal Puertorriqueña, Evidencia,* San Juan, Pubs. J.T.S., 1985, Vol. I, pág. 357. Véanse: *United States* v. *Evans,* 635 F.2d 1124 (4to Cir. 1980); *State* v. *Hansen,* 312 N.W.2d 96 (Minn. 1981); Nota, *Declarations Against Penal Interest: Standards of Admissibility Under an Emerging Majority Rule,* 56 B.U.L. Rev. 148, 169 (1976).

Como corolario, tampoco es argumentable que la manifestación a su hija diera margen a un posible encubrimiento. "[C]on respecto a la aceptación de la conducta criminal, el

tribunal debe cuidadosamente evaluar las circunstancias para determinar si tal aceptación aparenta ser para el declarante, cuando la hizo, contraria a su interés. Lo crucial no es si lo afirmado por el declarante podía probablemente resultar en una acusación criminal, sino *si éste así lo percibió.* Si el declarante ya estaba en problemas, lo determinante es si *él pensó que su manifestación mejoraba o empeoraba su posible castigo criminal.*" (Traducción y énfasis nuestro.) Binder, *Hearsay Handbook,* 2da ed., Colorado, Shepard's McGraw-Hill, 1983, pág. 388. "[N]o es el hecho de que la declaración sea contra el interés, *sino el conocimiento de tal hecho* por el declarante lo que *da significado* a la afirmación." (Traducción y énfasis nuestro.) B.S. Jefferson, *Declarations Against Interest: An Exception to the Hearsay Rule,* 58 Harv. L. Rev. 1, 17 (1944).

## IV

Pero hay más. Arguyendo que nos inclinemos a seguir la trayectoria judicial de admitir en su totalidad la declaración —aun cuando fuera de carácter mixto y cargada más de contenido exculpatorio— ello tampoco la haría admisible. Dicha declaración no supera el escollo de que carece del requisito de *conocimiento personal del asunto central,* a saber, quién o quiénes asesinaron a "Papi Sammy". No hay datos suficientes en dicha declaración para inferir y concluir que la madre de la testigo *presenciara ese hecho.* La *única* prueba al respecto la sitúa *dentro* del apartamento del edificio 22, y el asesinato de "Papy Sammy" ocurrió en el automóvil de éste, que estacionó distante, frente al edificio 20. Binder, *op. cit.,* pág. 371.

En resumen, actuó correctamente el tribunal sentenciador al estimar en el ejercicio de su informada discreción, que la porción excluida no era admisible por, realmente, no ser una declaración contra intereses y carecer la declarante del

conocimiento personal del asunto central, esto es, el autor del asesinato de "Papi Sammy".

Dicho foro de instancia sólo permitió ante el jurado la única prueba admisible. Al respecto, basta recordar la alegada admisión *directa* de "Algarín" a la testigo *Mary Rodríguez* de que él asesinó a "Papi Sammy". Esa prueba presentada fue aquilatada, en su valor probatorio, por dichos juzgadores. La parte de la declaración no admitida *sólo* giraba sobre el aspecto del arma, lo cual no excluía la participación real por el aquí apelante Mendoza Lozada.

Si, además de lo expuesto, anotamos que Algarín fue asesinado el 9 de octubre de 1983, y que la testigo Mary Rodríguez era *cuñada* del acusado Mendoza Lozada, nos percatamos de las poderosas razones por las cuales el tribunal sentenciador se negó válidamente a admitir esa parte del testimonio. Aun bajo un enfoque de extrema liberalidad, todas estas circunstancias *derrotaban la usual garantía de confiabilidad* en que se apuntala la Regla 64(B)(3) de Evidencia, *supra*, para justificar la admisibilidad de la declaración extrajudicial de un testigo no disponible. Chiesa, *op. cit.*, pág. 356. Respetaríamos el ejercicio de ese discernimiento judicial integral e informado.