Aida Ileana Oquendo Graulau
Secretaria General

**ESCOLIOS 2004 DTA 123**

**1.** Caso Núm. KCU-03-0127(706).

**2.** Caso Núm. KCU-03-0132(708).

**3.** Ello, debido a que el mismo 12 de julio de 2004, la Secretaría de este Tribunal no pudo lograr comunicación telefónica ni vía fax con la representante legal de la Sra. Rodríguez, siendo posible dicha notificación al siguiente día, 13 de julio de 2004.

**4.** Regla 23.1(c)(1) de Procedimiento Civil, 32 L.P.R.A. Ap. III.

**5.** Igualmente, están disponibles las órdenes protectoras esbozadas en la Regla 23.2 de Procedimiento Civil. De manera particular, esta regla permite que el tribunal emita una orden protectora para que no se lleve a cabo el descubrimiento de ciertas materias o que se limite el alcance de las mismas. Regla 23.2 (d) de Procedimiento Civil. 32 L.P.R.A. Ap. III.

**6.** La revisión se da contra la decisión, no contra sus fundamentos. *Pérez v. Criado Amunategui,* **2000 J.T.S. 105**, 151 D.P.R. ___ (2000); *Pagán v. Alcalde Mun. de Cataño,* 143 D.P.R. 314 (1997); *Piñeiro v. International Air Service,* 140 D.P.R. 343 (1996); *Vélez Rodríguez v. Amaro Cora,* 138 D.P.R. 182 (1995).

# 2004 DTA 124

### TRIBUNAL DE CIRCUITO DE APELACIONES
### REGIÓN JUDICIAL DE AGUADILLA

EL PUEBLO DE PUERTO RICO
Apelado

v.

MARISABEL PIÑERO MARTÍNEZ
Apelante

Núm. KLAN-03-01371

San Juan, Puerto Rico, a 29 de julio de 2004

Panel integrado por su Presidenta, la Juez López Vilanova,
el Juez Córdova Arone y la Juez Feliciano Acevedo

López Vilanova, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El recurso de epígrafe se presentó ante este Tribunal el 17 de noviembre de 2003. Concedidas todas las prórrogas solicitadas, el 14 de mayo de 2004 se presentó exposición estipulada de la prueba. El 8 de junio de 2004, la apelante presentó su alegato. En esa misma fecha se elevaron los autos. Un mes después, el 8 de julio de 2004, el Procurador General presentó su escrito. Con el beneficio de dichos escritos, la prueba documental, la exposición estipulada de la prueba oral y los autos originales, procedemos a resolver.

**I**

El ministerio público presentó cargos contra la apelante Marisabel Piñero Martínez por los delitos de apropiación ilegal y traspaso de documentos falsificados. ■ Luego de los trámites de rigor, se celebró el juicio por tribunal derecho, durante los días 29, 30 de julio y 7 de agosto de 2003. Evaluada la prueba documental y testifical presentada por El Pueblo así como la prueba presentada por la defensa, el Tribunal le encontró culpable, le sentenció a la pena de nueve (9) años bajo el régimen de libertad a prueba. Inconforme, presentó el recurso que nos ocupa.

En sus señalamientos de error discutidos en su posterior alegato cuestiona, en esencia, la admisibilidad de

determinada prueba documental y la negativa del foro recurrido a absolverla perentoriamente. Por último, sostiene que el ministerio público incumplió el mandato constitucional de probar los cargos más allá de toda duda razonable. █

A los fines de examinar a su reclamo, veamos la prueba en que el ministerio público apoyó los cargos.

## II

Surge de la exposición estipulada de la prueba (E.E.P.) sometida por las partes que el fiscal presentó cinco (5) testigos: Danilo Rosado Guillet, vicepresidente de la Cooperativa de Ahorro y Crédito de Rincón; Ricardo Levy Echeandía, ejecutivo de la banca; María E. Quiles Quiñones, Luis A. Carrero y Rosa Sepúlveda Casiano.

La apelante prestó testimonio en su defensa. Presentó, además, al policía Julio A. Sánchez Ruiz. Examinemos sus testimonios y la prueba documental presentada.

### 1. Danilo Rosado Guillet

Declaró que es contador y vicepresidente de la Cooperativa de Ahorro y Crédito de Rincón. Conoce al testigo Luis Carrero porque es socio de la Cooperativa y residente de Rincón. Asimismo, manifestó conocer a la testigo Marta Quiles y a su esposo, Sr. Wilfredo Bonnet, por idénticas razones. E.E.P., pág. 2.

Luis Carrero y Marta Quiles hicieron unos retiros de sus respectivas cuentas de ahorros en la mencionada Cooperativa por la expedición de cinco (5) cheques que fueron emitidos a favor de Francisco Levy, hijo, y otros a favor de Marisabel Piñero Martínez. El Sr. Luis Carrero solicitó copia de los cheques una vez cancelados. Manifestó desconocer el motivo de los cheques.

Indicó que vio los cheques por una orden del tribunal. E.E.P., pág. 2. Contra la cuenta de la señora Quiles se expidieron cuatro (4) cheques; estos fueron parte de la prueba y se identificaron como sigue: (i) Exhibit 1-A por la suma de $2,000, a favor de Francisco Levy; (ii) Exhibit 1-B por la cantidad de $879, a favor de Marisabel Piñero Martínez (E.E.P., págs. 2-3 y 4); (iii) Exhibit 1-C por la cantidad de $20,000, a favor de Francisco Levy; y (iv) Exhibit 1-D por la suma de $10,000, a favor de Francisco Levy. Contra la cuenta del Sr. Luis Carrero se expidió un cheque por la cantidad de $20,000, a favor de Francisco Levy. (Exhibit 1-E). E.E.P., págs. 2-3.

Los cheques fueron pagados por el Banco Popular de Puerto Rico, contra la cuenta de la Cooperativa de Ahorro y Crédito de Rincón.

Durante el contrainterrogatorio, manifestó que los cheques fueron emitidos en distintas fechas y que desconoce quién los cobró y el propósito de ello. El cheque por la cantidad de $879, identificado como Exhibit 1-B, no figura endosado, pero fue pagado y consta el número de cuenta. E.E.P., pág. 3.

Como regla general, en la forma como se efectúan negocios bancarios, se satisface el monto del cheque si la persona a cuyo nombre se emite tiene cuenta en la institución donde se deposita, sin ser necesario el endoso. Asimismo, se aceptan depósitos de cheques endosados por más de una persona, para lo cual sólo se requiere identificar la segunda persona. Finalmente, manifestó que la Cooperativa no lleva un registro del propósito o para qué transacción se utiliza el dinero de las cuentas. E.E.P., pág. 3.

### 2. Ricardo Levy Echeandía

Declaró que es ejecutivo de la Banca y Construcción. Conoce a la imputada, Sra. Marisabel Piñero Martínez, por haber fungido como abogada de su padre, Francisco Levy Cumpiano, conocido también como Francisco Levy, hijo. La imputada representaba como abogada-notario a su padre en distintas transacciones de

compraventa de solares localizados en el Municipio de Rincón, en la que la primera coordinaba la compraventa. Él no participó en transacción alguna en que ella actuara como abogada-notario. E.E.P., págs. 4 y 5.

Las fincas donde se segregaban los solares están localizadas en los Barrios Ensenada y Puntas, del Municipio de Rincón. Conoce a la Sra. Marta Quiles y Wilfredo Bonnet porque compraron solares a su padre. El precio fue de $30,000, pagada con $10,000 de la opción (pagado mediante cheque a la Lcda. Piñero Martínez) y luego $20,000. E.E.P, pág. 4. La señora Quiles le manifestó que había entregado un cheque por $20,000, emitido a favor de su padre Francisco Levy a la apelante, licenciada Piñero Martínez. La escritura de compraventa fue otorgada ante la mencionada abogada. También conoce al Sr. Luis Carrero porque compró un solar a su padre, y éste le informó que entregó un cheque por $20,000 a la imputada, Lcda. Piñero Martínez. E. E.P., pág. 5.

Indicó que, luego de una investigación, surgió que los respectivos pagos finales por $20,000 de ambos solares no habían llegado a su padre. Así, su padre, Francisco Levy Cumpiano (Francisco Levy, hijo) presentó una demanda juramentada sobre cobro de dinero contra la Lcda. Piñero Martínez reclamando el dinero adeudado ($20,000 del señor Carrero y $20,000 de los esposos Bonnet-Quiles, Exhibits 1-C y 1-E) y honorarios de abogado. Vio la demanda cuando sus padres la juramentaron en su residencia, la preparó su abogado. Indicó que su padre falleció en abril de 2002, luego de la presentación de la demanda. E.E.P., págs. 5-6. Conoce la firma de su padre hace más de 30 años por ser fundador presidente de la corporación familiar de la cual formó parte e ingeniero y ejecutivo de la firma. Declaró que respecto a los cheques Exhibit 1-C y 1-E (cada uno por la suma de $20,000), no reconoce la segunda firma que endosa los cheques y el primer nombre que aparece al dorso es de Francisco Levy, hijo, el cual no se asemeja a la firma de su padre. La firma de su padre era muy compleja, requería cuatro pasos y añadía unos puntos que ubicaban encima de la "l" y de la "j" de la palabra "hijo". En cuanto al cheque identificado como Exhibit 1-D (por la cantidad de $10,000 de la opción a compra, fechado 14 de noviembre de 2000), la firma de endoso en el cheque sí corresponde a la de su padre. Los cheques de $20,000 están fechados 5 de marzo de 2001. E.E.P., pág. 6.

Indicó que su padre le donó un solar a la Lcda. Piñero Martínez, lugar donde ella reside. Manifestó que su padre y la referida abogada tenían una relación de confianza. Explicó que los honorarios como notario de la Lcda. Piñero Martínez los pagaba el comprador y así se estableció en los contratos de opción. Por los expedientes de dominio, la Lcda. Piñero Martínez facturó y se le pagó con cheque. Y que no existe ninguna deuda pendiente. E.E.P., pág. 7.

En la vista de determinación de causa, celebrada en agosto de 2002, indicó que desconocía si existía alguna deuda por concepto de honorarios de abogado. Y declaró tener conocimiento que su padre autorizó a la Lcda. Piñero Martínez a recibir dinero de sus negocios.

Desconoce si su padre había autorizado a Piñero Martínez a endosar documentos por él. Por conducto de su abogado, hizo gestiones de cobro a Piñero Martínez, previo a la presentación de la querella criminal. La querella se presentó en fecha posterior a la demanda, esto, luego de darle oportunidad para pagar. E.E.P., págs. 7-8.

Declaró desconocer si su padre le entregaba a la señora Piñero cheques emitidos a su favor y endosados por él. En cuanto al cheque por $2,000, Exhibit 1-A, declaró que fue expedido el 14 de noviembre de 2000 a favor de Francisco Levy, hijo. El primer endoso lee Francisco Levy, hijo, y que no reconoce el segundo endoso, pero es igual a los otros. Manifestó que ese cheque fue depositado en la misma cuenta que los otros, que entiende que le pertenece a la señora Piñero Martínez. Desconoce si ese cheque fue expedido a favor de Francisco Levy, hijo, para pagar los honorarios del ingeniero contratado para mensurar y solicitar la segregación de los dos solares vendidos, ante la Administración de Reglamentos y Permisos. Desconoce si su padre autorizó a la señora Piñero Martínez a utilizar dinero de cheques expedidos a favor de su padre para que ésta pagara deuda de

éste. E.E.P., págs. 8-9.

En relación con el Exhibit I-D (cheque por la cantidad de $10,000, con fecha de 14 de noviembre de 2000); el Exhibit I-C (cheque por la cantidad de $20,000, con fecha de 5 de marzo de 2001); y el Exhibit I-E (cheque por la cantidad de $20,000, con fecha de 5 de marzo de 2001); testificó desconocer si a esas fechas su padre debía dinero a la Lcda. Piñero Martínez por concepto de servicios prestados, por pago adelantado o préstamo. E. E.P., pág. 9.

Declaró que nunca ha recibido, como albacea, factura alguna de la Lcda. Piñero Martínez. Las facturas que revisó como albacea, por servicios prestados por dicha licenciada, fueron pagadas con cheques de la corporación Francisco Levy, hijo. Reiteró que los honorarios de la Lcda. Piñero Martínez los pagaban los compradores. Señaló que sólo conoce de uno o dos casos en los que la referida abogada envió el cheque expedido a favor de su padre a la dirección de la oficina o de su residencia, o los entregaba físicamente. E.E.P., pág. 10.

En algunas ocasiones recibió facturas de la licenciada Piñero Martínez dirigidas a Francisco Levy, hijo, Inc. y otras a Francisco Levy. Las facturas que vio dirigidas a la corporación eran por concepto de trabajos realizados a la corporación. Indicó que, por ser tesorero, era responsable de pagar las facturas. E.E.P., pág. 10. Asimismo, reconoció que pueden existir facturas a su padre y que no las viera. E.E.P., pág. 11.

Luego del fallecimiento de su padre, él estaba a cargo de recibir todas las facturas por servicios prestados a Francisco Levy Cumpiano y a sus corporaciones, ya que él era el albacea de la sucesión. No recibió factura de la licenciada Piñero Martínez, pero desconoce la fecha en que cesaron las gestiones profesionales de ésta. E.E. P., pág. 11.

3. **María E. Quiles Quiñones**

Declaró que conoce hace mucho tiempo al Sr. Francisco Levy. En el año 2000, le compró un solar de 500 m/c, en el Barrio Puntas, por la suma de $30,000. Manifestó que pagó $10,000 por la opción y luego pagó $20,000 para saldar el balance, más honorarios de ingeniero y abogados. Indicó que pagó primero tres cheques: (1) uno de $10,000 a favor de Francisco Levy, hijo; (2) otro por la cantidad de $2,000 a favor de Francisco Levy para el pago del ingeniero; (3) y otro por la suma de $879 a favor de la licenciada Piñero Martínez para el pago de honorarios de abogado y gastos legales. E.E.P., pág. 11.

Manifestó que el cheque por la suma de $20,000, Exhibit I-C, fue expedido a favor de Francisco Levy, hijo, para el pago final. En marzo de 2001, **entregó ese cheque a la imputada, licenciada Piñero Martínez, en su oficina, quien le manifestó que llevaría el referido cheque al Sr. Francisco Levy.** E.E.P., págs. 11 y 12. Luego se otorgarían las escrituras. Todos los cheques fueron emitidos por la Cooperativa de Ahorro y Crédito de Rincón. E.E.P., pág. 11. Señaló que, luego de esperar un tiempo, pidió las escrituras a la licenciada imputada, pero ésta indicó que el señor Levy no se las había enviado. E.E.P., pág.12.

Durante el contrainterrogatorio, indicó que entregó los cheques a la licenciada Piñero, pues entendía que era la representante del señor Levy y conocía la relación profesional entre ambos. En el año 1999, le compró un solar al señor Levy y las gestiones las tramitó la licenciada Piñero; transacción similar a la de autos porque hizo dos pagos, uno de $10,000 y otro de $20,000. En cuanto al cheque por la cantidad de $2,000. (Exhibit 1-A), lo entregó a la licenciada Piñero Martínez y el cheque consta a favor de Francisco Levy y tiene fecha de 14 de noviembre de 2000. E.E.P., pág. 12.

## 4. Luis A. Carrero

Declaró que firmó el contrato de opción de compra en noviembre de 2000 por un solar del Sr. Francisco Levy, firmaron él, su esposa, el Sr. Francisco Levy y la esposa de éste. (Exhibit I Estipulado). Pagó el solar en dos cheques emitidos por la Cooperativa de Ahorro y Crédito de Rincón. El cheque por $10,000 lo hizo a nombre de Francisco Levy, hijo, según le solicitó la licenciada Piñero Martínez. El cheque por $20,000 (Exhibit 1-E), pagaderos al otorgar la escritura, lo entró a la licenciada Piñero Martínez. La escritura se otorgaría cuando se pagara el balance adeudado y cuando obtuviera el permiso de segregación de la Administración de Reglamentos y Permisos. E.E.P., pág. 13.

Manifestó que hizo un cheque por la cantidad de $13,000 que lo cobró el Sr. Francisco Levy en su totalidad, éste cheque incluia los $10,000 de la opción y $3,000 por honorarios de abogado y gastos legales. E.E.P., pág. 14.

## 5. Rosa Sepúlveda Casiano

Declaró que es subgerente de operaciones del Banco Popular, sucursal de Rincón. Conoce a la licenciada Piñero Martínez porque es cliente del banco. Recibió una solicitud del tribunal para proveer copia del estado de cuenta de la señora Piñero Martínez, correspondientes al mes de marzo del año 2001, por dos depósitos sobre los cuales se estaba haciendo una reclamación. Se trataba de una *"flexicuenta"* o cuenta de negocios. Indicó que el estado de cuenta de la licenciada Piñero Martínez (Exhibit 2 Estipulado) refleja un depósito de $20,000 efectuado el 5 de marzo de 2001 y otro realizado el 7 de marzo de 2001, también por la cantidad de $20,000. Ambos consistían en cheques emitidos por la Cooperativa de Ahorro y Crédito de Rincón a favor de Francisco Levy, hijo. Indicó que el comienzo del período que cubre el estado de cuenta de la licenciada Piñero Martínez, el balance de depósito era de $62.02 para el mes marzo de 2001. Al final del período del mes de marzo, el balance fue de $8,575.83. En ese período se depositaron los dos cheques de $20,000, los cuales estuvieron disponibles inmediatamente porque la Cooperativa de Ahorro y Crédito de Rincón tiene una cuenta comercial en el mismo Banco Popular. El estado de cuenta refleja otros depósitos que ascienden a $6,747. E.E.P., págs. 14-15.

**Prueba de la defensa:**

## 1. Policía Julio A. Sánchez Ruiz

Es miembro de la Policía de Puerto Rico asignado al Cuartel de Rincón. El 30 de mayo de 2002 se presentó al Cuartel el Sr. Ricardo Levy a presentar una querella sobre apropiación ilegal de cheques por parte de la señora Piñero Martínez. E.E.P., pág. 15. Los cheques estaban emitidos a favor de Levy y afirmó que la firma que tenían por detrás decía Levy, luego indicó que era la firma del padre. Indicó que el perjudicado era la persona que representaba los intereses de la familia y que el Sr. Francisco Levy había fallecido. Indicó que el Sr. Ricardo Levy le mostró copia de la demanda civil, que trata de cobro de dinero y alegaba que se apropiaron. Se comunicó con el fiscal Félix Villanueva, en Aguadilla, y éste le dijo que presentara un formato de servicio y que dejara que la denuncia siguiera su curso. Indicó desconocer la fecha en que se alegaba la comisión del delito. Manifestó desconocer porqué no se presentó querella por el cheque de $2,000. Indicó que el Sr. Francisco Levy no se había querellado contra la licenciada Piñero Martínez y tampoco habló con él. E.E.P., pág. 16.

## 2. Marisabel Piñero Martínez

Indicó que el Sr. Francisco Levy Cumpiano, conocido como Francisco Levy, hijo, contrató sus servicios profesionales para coordinar gestiones para la segregación y compraventa de solares ubicados en el Municipio

de Rincón. El señor Levy, hijo, fue su cliente por 14 años, desde febrero de 1989 hasta el año 2001. Manifestó que las gestiones profesionales relacionadas con la corporación se facturaban a ésta, pero las gestiones personales al Sr. Francisco Levy se le facturaban a éste, no a la corporación. Tenía autorización del señor Levy para recibir dinero de las opciones a compra y de pagos finales, realizar pagos de los dineros que se le entregaban dirigidos al señor Levy para pagar otros servicios, para endosar cheques emitidos a favor del señor Levy. E.E.P., pág. 17.

Para el mes de marzo de 2001, tenía autorización para descontar el pago final del Sr. Luis A. Carrero, los honorarios por servicios prestados por el Ing. Felipe Colón ascendentes a $2,000 y $1,000 por concepto de honorarios de abogado y gastos legales, los cuales fueron pagados mediante cheque por $13,000 en noviembre de 2000, el cual fue cobrado en su totalidad por el señor Levy. Con ese dinero pagó al ingeniero y la limpieza de otro solar vendido al señor Carrero.

Hacía varios años no realizaba trabajos para la corporación. Facturaba por asuntos personales directamente al Sr. Francisco Levy, hijo, muchas veces por teléfono. En ocasiones, el señor Levy le enviaba un cheque personal y en otras ocasiones, la autorizaba a descontar los servicios realizados del dinero que ella recibía por concepto de venta, opción de compra y renta de fincas. E.E.P., págs. 17-18.

Existía una relación estrecha y cordial con el señor Levy y su esposa, pero su relación con Ricardo Levy era mínima. Sin embargo, declaró desconocer cuánto conocía Ricardo Levy sobre las gestiones que ella realizaba para su padre, señor Levy, hijo. E.E.P., pág. 18.

Declaró que realizaba múltiples gestiones que le solicitaba el señor Levy, hijo, todas ellas de forma verbal como asesora, abogada y notario. E.E.P., pág. 18.

Con relación a la Sra. Marta Quiles y su esposo, declaró que del precio de compraventa no se descontó cantidad alguna. Los descuentos que realizó fueron por concepto de deudas del señor Levy, hijo, por concepto de servicios profesionales prestados o pagos por ella realizados que debían serle reembolsados por él. Custodiaba dinero del señor Levy, hijo, con su autorización. Admitió que escribió en ambos cheques *"el nombre"* del señor Levy, hijo, porque éste la había autorizado a endosar los cheques para cambiarlos. (Exhibit 1-C y Exhibit 1-E). E.E.P., pág. 19.

Durante los 14 años de relación profesional con el señor Levy, sólo en cuatro ocasiones los compradores expidieron cheques a favor de Levy y ella (señora Piñero Martínez). En el año 1995, por encontrarse de vacaciones, ella autorizó al señor Levy a que firmara por ella el cheque que unos compradores habían emitido a favor de ambos. E.E.P., pág. 19.

En cuanto a las transacciones en cuestión, indicó que en marzo de 2001, la compraventa de Luis Carrero, el señor Levy le autorizó a descontar $3,000 y, para poder descontarlos, el señor Levy le autorizó a cambiar los cheques. En relación con la compraventa de los esposos Bonnet-Quiles, indicó que en noviembre de 2000, la señora Quiles le entregó tres cheques, pero que el cheque para pagar el ingeniero fue expedido a nombre de Levy, hijo, por lo que éste la autorizó a endosarlo por él y pagarle al ingeniero. E.E.P., pág. 20.

Admitió que por el cheque de $20,000 que le entregó la señora Quiles, ella lo endosó por el señor Levy, hijo porque la relación de amistad con el señor Levy, los cargos por servicios se englobaban o acumulaban durante años, ella le notificaba el monto y él le enviaba el dinero o la autorizaba a retener dinero dirigido a él. Declaró que en los dos cheques por $20,000, ella no firmó por el señor Levy, hijo, sino que escribió su *"nombre"*. Declaró que utilizó el dinero prestado para cubrir gastos médicos de un familiar. E.E.P., pág. 20.

Tiene un récord de las gestiones profesionales realizadas por solicitud del señor Levy, hijo, durante los años

1998 al 2001. En cuanto a su cuenta, dijo que consta como Marisabel Piñero Martínez y Jorge Moreno Franco, haciendo negocios como Bufete Moreno-Piñero. Del cheque de $20,000 del señor Carrero descontó, además de los $3,000 autorizados por el señor Levy, aproximadamente entre $16,000 y $17,000 de honorarios adeudados previamente por el Sr. Francisco Levy, desde el 1998. Sin embargo, no facturó por escrito dichos servicios. Tampoco expidió un recibo a favor del señor Levy. E.E.P., pág. 21. Del estado de cuenta, identificó un débito por la cantidad de $7,000 que fue utilizado para gastos de hospitalización de un familiar. Gran parte de los honorarios y del *"préstamo"* hecho al señor Levy lo utilizó para resolver el problema médico-familiar. Ella y el señor Levy no hablaron sobre la forma de pago del préstamo. E.E.P., pág. 21.

Especificó que cuando recibió los dos cheques por la cantidad de $20,000 en marzo de 2001, el señor Levy le indicó que como partiría a Estados Unidos para recibir un tratamiento de cáncer, depositara el dinero en su cuenta y que a su regreso, se comunicarían. Declaró que el 8 de marzo de 2001, depositó los cheques. Respecto a la demanda civil, declaró que consignó $9,190 en el tribunal. En la demanda se alega que no se le había autorizado a endosar los cheques en cuestión, ni a depositarlos. Que ella estaba autorizada a depositar y endosar cheques, lo que se evidencia con el cheque $2,000 que fue emitido a favor del señor Levy y que ella utilizó, con la autorización de éste, para pagar al ingeniero y no se le presentaron cargos por dicha suma. Indicó que se allanó a la determinación de causa probable en Regla 6 en alzada y en vista preliminar, toda vez que había consignado un dinero en el tribunal y estaba en negociaciones para transar el caso civil. E.E.P., pág. 22. La imputada admitió que nunca antes de ese momento había declarado que hubiese endosado los cheques y retenido el dinero en calidad de préstamo y como pago de honorarios, con la autorización del señor Levy. E.E.P., pág. 23.

### III

Esta fue la prueba que tuvo ante sí el foro recurrido. Evaluada la misma, encontró a la aquí apelante culpable de los cargos imputados.

En su primer señalamiento de error, la apelante plantea como insuficiente el mecanismo de autenticación mediante el cual el testigo de cargo, Ricardo Levy Echeandía, certificó que los endosos que figuran en los cheque a favor de su padre (Francisco Levy, hijo) no correspondían a la firma de éste. En apoyo a su contención, la apelante cita la Regla 76 de Evidencia, 32 L.P.R.A. Ap. IV, y argumenta que el testimonio del señor Levy Echeandía no goza de confiabilidad, ya que éste fue quien originó la denuncia contra la señora Piñero Martínez. Véase. *"Alegato de la Apelante"*, págs. 3-4. Veamos su reclamo.

Autenticación de evidencia *"significa establecer que lo que el proponente sostiene que la evidencia es, efectivamente lo es"*. Ernesto L. Chiesa Aponte, *Tratado de Derecho Probatorio* (Reglas de Evidencia de Puerto Rico y Federales), **Publicaciones J.T.S.**, 1998, T. II, sec. 10.1, pág. 991. Sobre las instancias o medios de autenticación e identificación de evidencia, dispone la Regla 76, 32 L.P.R.A. Ap. IV, como sigue:

*"De conformidad con los requisitos de la regla anterior y sin que se interprete como una limitación, son ejemplos de autenticación o identificación los siguientes:*

*(A) Autenticidad mediante evidencia de la letra – Un escrito podrá autenticarse mediante evidencia de que la letra del autor es genuina. A esos fines, un testigo no perito podrá expresar su opinión sobre si un escrito es de puño y letra del presunto autor a base de su familiaridad con la letra del presunto autor, si dicha familiaridad no se adquirió con miras al pleito. La autenticidad podrá demostrarse también mediante la comparación o cotejo que haga el juzgador o un testigo perito del escrito en controversia con otro escrito debidamente autenticado.*

*[...]*

*(G) Autenticación mediante admisión. – Un escrito u otro material puede ser autenticado mediante evidencia de que la parte contra quien se ofrece admitió su autenticidad en cualquier momento, o mediante evidencia de que ha sido aceptado como auténtico por la parte contra la cual se ofrece."*

Un testigo **no** perito puede autenticar evidencia a base de su conocimiento sobre la letra del documento o de los firmantes. En el caso que nos ocupa, la apelante basa gran parte de su señalamiento en la suposición no fundamentada de que el hijo del Sr. Francisco Levy, Ricardo Levy Echeandía, se familiarizó con la firma de su padre exclusivamente por motivo de la querella que éste presentó contra la señora Piñero Martínez. Ahora bien, la limitación de la Regla 76 referente *"'con miras al pleito' se refiere a si la familiaridad del testigo con la letra del autor se debe sólo al propósito de la litigación"*. Ernesto L. Chiesa Aponte, *op. Cit.*, pág. 1004.

En el presente caso, resulta difícil coincidir con la teoría de la apelante a los efectos de que el testigo Ricardo Levy Cumpiano se familiarizó con la firma de su padre única y exclusivamente debido al caso criminal que instara contra la apelante. Ello, cuando tomamos en consideración que éste declaró que conoce la firma de su padre (Francisco Levy Cumpiano, conocido por Francisco Levy, hijo) hace más de 30 años por ser fundador presidente de la corporación familiar de la cual formó parte e ingeniero y ejecutivo de la firma. E.E.P., pág. 6. En vista de esa familiaridad, declaró categóricamente que la supuesta firma endosando los dos cheques por la suma de $20,000 cada uno (Exhibits 1-C y 1-E), ni siquiera se asemeja a la firma de su padre. Explicó que la firma de su padre era muy compleja, requería cuatro pasos y añadía unos puntos que ubicaban encima de la *"l"* y de la *"j"* de la palabra *"hijo"*. En cuanto al cheque identificado como Exhibit 1-D (por la cantidad de $10,000 de la opción a compra, fechado 14 de noviembre de 2000), la firma de endoso en el cheque <u>sí</u> corresponde a la de su padre. Los cheques de $20,000 están fechados 5 de marzo de 2001. E.E.P., pág. 6.

Debemos recordar, además, que la propia apelante admitió que ella escribió en los referidos cheques. (Exhibits 1-C y Exhibit 1-E) *"el nombre"* del señor Levy, hijo, para depositarlos en su cuenta. E.E.P., pág. 19. Ello constituye un medio de autenticar por admisión (Regla 76(G)) que el endoso que figura en los cheques a nombre de Francisco Levy, hijo, no es de éste.

Independientemente de lo anterior y, aún cuando se considerara cometido el alegado error evidenciario, el mismo sería un error no-perjudicial que no conlleva la revocación de la sentencia como se alega.

El criterio para determinar si un error en materia de evidencia acarrea revocación, es determinar si, de no haberse cometido el error, probablemente el resultado hubiera sido distinto. *Pueblo v. Mangual Hernández*, 111 D.P.R. 136 (1981); *Pueblo v. Rosaly Soto*, 128 D.P.R. 729 (1991); *Pueblo v. Mendoza Lozada*, 120 D.P.R. 815 (1988). La admisión o exclusión errónea de evidencia no acarrea revocación, a menos que el tribunal apelativo estime que éste fue factor decisivo o sustancial en la sentencia o decisión cuya revocación se solicita. Regla 4 y 5 de Evidencia, 32 L.P.R.A. Ap. IV, R. 4 y 5. Esto obedece a la realidad de que en los juicios o vistas evidenciarias se cometen, de ordinario, algunos errores de derecho probatorio. La parte que sufre un error de admisión o exclusión errónea de evidencia en violación a sus derechos, no ha de prevalecer en apelación, si a juicio del tribunal de apelaciones el resultado hubiera sido el mismo de no haberse cometido el error. *Chapman v. California*, 386 U.S. 18 (1966), y *Pueblo v. Ramos Álvarez*, 118 D.P.R. 82 (1987). El error señalado no se cometió.

En su segundo señalamiento de error, la apelante señala, sin más, que el foro de instancia erró al no absolverla perentoriamente porque la prueba de cargo era insuficiente para probar la comisión de los delitos de apropiación ilegal agravada y posesión y traspaso de documentos falsificados y su conexión con la apelante. *"Alegato de la apelante"*, pág. 10. El señalamiento es inmeritorio.

A tenor de lo dispuesto en la Regla 135 de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, [3] una absolución perentoria es la facultad que tiene un tribunal para examinar la suficiencia de la prueba de cargo y

decretar, a base de dicho examen, la no culpabilidad de un acusado. *Pueblo v. Colón, Castillo,* 140 D.P.R. 564, 576 (1996).

Al amparo de dicha Regla, el tribunal de primera instancia no comete error al declarar sin lugar una moción de absolución perentoria presentada por un acusado bajo los fundamentos establecidos en la Regla, cuando el Pueblo ha presentado un caso *prima facie* contra el acusado. *Pueblo v. Rivera Diodonet*, 121 D.P.R. 454 (1988).

Al evaluar una moción de absolución perentoria, el análisis de suficiencia de la prueba que hace el tribunal asegura que la prueba de cargo contenga al menos un mínimo de los requisitos imprescindibles para permitir que el caso pase a manos del jurado. Estos requisitos son aquéllos que establece el derecho para configurar el delito; aquéllos sin los cuales no podría hallarse culpable a un acusado, independientemente de los méritos valorativos de la prueba presentada. El análisis de la suficiencia de la prueba, contrario a la evaluación de la credibilidad, requiere poder identificar en la prueba aquellos elementos necesarios en derecho para poder concluir que una persona es culpable de cometer un delito. Debido a que obliga al juez que preside el proceso a interpretar el derecho penal, desde el punto de vista procesal y evidenciario, quien desempeña esta función debe dominar, o al menos estar instruido detalladamente, sobre los requisitos que el derecho exige para concluir que se ha violado la ley.

Es decir, el tribunal ha de cerciorarse de que el ministerio público haya aducido prueba, directa o circunstancial, de todos los elementos del delito imputado. También se exige que la evidencia conecte al acusado con el delito imputado, función eminentemente propia al juzgador de credibilidad. Dentro de la responsabilidad del tribunal de examinar la suficiencia, éste ha de asegurarse de que la prueba de cargo, de ser creída, pueda conectar al acusado con el delito imputado.

Al evaluar una solicitud de absolución perentoria, el criterio de insuficiencia de prueba no debe confundirse con prueba conflictiva o contradictoria. Ello implica que el juez, al adjudicar una moción a tales efectos, no puede resolver conflictos en la prueba ni dirimir credibilidad. Tampoco puede absolver perentoriamente sólo porque considere que la prueba del acusado es más sólida que la del ministerio público. Este balance probatorio debe ser dirimido por el juzgador de hechos en primera instancia y en último caso mediante apelación por el foro apelativo al amparo del criterio de evaluación de la prueba en apelación. Ernesto L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Editorial Forum, 1993, Vol. III, págs. 415-419.

Contrario a lo que aduce la apelante, el foro recurrido actuó correctamente al denegar la moción solicitando la absolución perentoria. En el presente, caso el ministerio público presentó prueba suficiente en derecho para sostener que la apelante se apropió ilegalmente, con la intención de defraudar, de dos cheques por la cantidad de $20,000 cada uno, pertenecientes a su cliente, Sr. Francisco Levy, hijo, endosándolos y depositándolos en su cuenta.

De la prueba presentada por el ministerio público, se desprende evidencia suficiente de todos los elementos de los delitos imputados y su conexión con la apelante. El testigo Levy Echeandía declaró que dos pagos finales por $20,000 de los solares vendidos al señor Carrero y a los esposos Bonnet-Quiles (Exhibits 1-C y 1-E), no habían llegado a su padre y los endosos de tales instrumentos no correspondían a la firma de su padre, Francisco Levy, hijo, quien era el tenedor. Asimismo, se estableció que el perjudicado, Francisco Levy, hijo, presentó una demanda juramentada sobre cobro de dinero contra la licenciada Piñero Martínez reclamando el dinero adeudado ($20,000 del señor Carrero y $20,000 de los esposos Bonnet-Quiles, Exhibits 1-C y 1-E) y honorarios de abogado.

De los testimonios del señor Carrero y de la señora Quiles se desprende que éstos entregaron los cheques en cuestión a la aquí apelante, quien estaba a cargo de los respectivos negocios jurídicos.

Por último, mediante el testimonio de la subgerente de operaciones del Banco Popular, Sra. Rosa Sepúlveda Casiano, se estableció que el estado de cuenta de la licenciada Piñero Martínez reflejaba un depósito de $20,000 efectuado el 5 de marzo de 2001 y otro realizado el 7 de marzo de 2001, también por la cantidad de $20,000. (Exhibit 2 Estipulado). Ambos consistían en cheques emitidos por la Cooperativa de Ahorro y Crédito de Rincón a favor de Francisco Levy, hijo. Y que al final del período de ese mes, el balance fue de $8,575.83. E.E. P., págs. 14-15.

No erró el foro recurrido al declarar sin lugar la moción de absolución perentoria.

## IV

Por último, la apelante plantea que no se probó su culpabilidad *"más allá de toda duda razonable"*, toda vez que no se probó la intención específica de apropiarse de los bienes ajenos y de defraudar. No estamos de acuerdo. La prueba que, conforme hemos transcrito, desfiló en este caso configura los elementos de los delitos imputados. El delito de apropiación ilegal imputado a la apelante establece que toda persona que ilegalmente se apropiare sin violencia ni intimidación de bienes muebles pertenecientes a otra persona será sancionada con pena de reclusión por un término que no excederá de seis meses, multa que no excederá de quinientos dólares, pena de restitución o cualquier combinación de éstas, a discreción del tribunal. El delito se considera agravado si, entre otras circunstancias, el valor de los bienes es de $200 o más.

El elemento esencial del delito es la apropiación por el acusado de unos bienes que no eran suyos. *Pueblo v. Padró*, 105 D.P.R. 713, 714 (1977). El término apropiarse incluye el malversar, defraudar, ejercer control ilegal, usar, sustraer, apoderarse, o en cualquier forma hacer propio cualquier bien o cosa de forma temporal o permanente. Artículo 7 del Código Penal, 33 L.P.R.A. sec. 3022 (5). El Código contempla todas las formas clásicas de deposición, despojo o interrupción de la custodia, posesión propia o propiedad -aquéllo que conlleva el aprehender una cosa y trasladarla- pero también abarcadoramente comprende todos los otros modos de lograr la posesión, transitoria o no, de un bien o cosa. *Pueblo v. Uriel Álvarez*, 112 D.P.R. 312, 317 (1982). La intención de defraudar la cual puede inferirse de las circunstancias relacionadas con la comisión de los hechos. *Pueblo v. Fernández Simono*, 140 D.P.R. 514, 521 (1996); *Pueblo v. Flores Betancourt,* 124 D.P.R. 867, 878 (1989).

De la exposición narrativa ante nosotros, surge que los cheques expedidos a favor del señor Levy, hijo, por la cantidad de $20,000 cada uno, fueron endosados por la apelante para poder depositarlos en una cuenta de su propiedad. La posición de la defensa a los efectos de que el señor Levy, hijo, autorizó el endoso de los cheques y que se prestó el dinero a la apelante, no le mereció credibilidad al juzgador de los hechos. Máxime cuando el perjudicado, aproximadamente un mes después de los hechos imputados, instó una demanda de cobro de dinero contra la apelante, por apropiarse ilegalmente de los cheques ascendentes a $40,000. De las anteriores circunstancias, puede inferirse razonablemente la intención de defraudar en la conducta desplegada por la aquí apelante al apropiarse de un dinero que no le pertenecía.

Aun asumiendo como cierto que la apelante tenía la *"custodia"* (que estaba autorizada a depositar en su cuenta dinero perteneciente al señor Levy) dinero del Sr. Francisco Levy, hijo, lo cierto es que ésta se valió de tal custodia para apropiarse ilegalmente del supuesto dinero custodiado. *Pueblo v. Rodríguez Jiménez*, 128 D.P. R. 114 (1991). En este sentido, la prueba demostró que al cierre del estado de cuenta, la apelante utilizó prácticamente todo el dinero apropiado ilegalmente para atender asuntos personales, aduciendo que parte de ese dinero lo obtuvo en calidad de préstamo. Como hemos expuesto anteriormente, si el dinero *"custodiado"* hubiese sido transferido a la apelante en calidad de préstamo, el Sr. Francisco Levy, hijo, no hubiera presentado una demanda en cobro de dinero contra la apelante, señora Piñero Martínez. Esta relación enmarcada en un ambiente profesional y de confianza, sirvió de base para que la apelante, actuando como profesional legal, se apropiara ilegalmente, sin violencia ni intimidación, de $40,000 pertenecientes al señor Levy.

En lo que refiere al delito de posesión y traspaso de documentos falsificados, el foro de instancia confirió credibilidad a la versión de los hechos de los testigos de cargo y la admisión de la propia apelante a los efectos de que **endosó** los cheques expedidos a favor del señor Levy, hijo, con el propósito de depositarlos en su cuenta bancaria. Es por ello que, como cuestión de derecho, lo imputado a la apelante en cuanto al traspaso o circulación de los cheques emitidos a favor del señor Levy, hijo, a sabiendas de que la firma del señor Levy en el endoso de los cheques fue falsificada, constituyó el delito de Posesión y Traspaso de Documentos Falsificados contemplado en el Artículo 272 del Código Penal, 33 L.P.R.A. 4592. Dicho Artículo dispone:

*"Toda persona que **con intención de defraudar a otra posea, use, circule, venda, pase o trate de pasar como genuino o verdadero cualquier documento, instrumento o escrito de las especificaciones en el artículo anterior a sabiendas de que los mismos son falsos, alterados, falsificados o imitados**, será sancionada con pena de reclusión por un término fijo de nueve (9) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de catorce (14) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de seis (6) años."* (Énfasis suplido.)

El delito de posesión y traspaso de documentos falsificados es un complemento del delito de falsificación de documentos tipificado en el Artículo 271 del Código Penal, 33 L.P.R.A. 451, ■ en tanto penaliza a la persona que posea, use, circule, venda, pase o trate de pasar como genuino o verdadero un documento, instrumento o escrito, a sabiendas de que es falso, alterado o falsificado. Un escrito se define en el Artículo 7 del Código penal como: *"cualquier impreso, papel, carta, sello, escritura o firma de una persona, moneda, papel moneda, fichas, tarjeta de crédito o cualquier otro símbolo o evidencia representativa de algún valor, derecho, privilegio u obligación"*.

El delito de posesión y traspaso de documentos, al igual que los delitos de apropiación ilegal y de falsificación de documentos, consistente en un delito de intención específica de defraudar. Dora Nevares-Muñiz, *Código Penal de Puerto Rico*, Revisado y Comentado, 7ma ed., Hato Rey, Ed. Instituto para el Desarrollo del Derecho, 2001, pág. 519. Así, resulta necesario que se demuestre que el escrito se *"posee con la intención de defraudar a otra persona y conociendo que el mismo es falsificado"*. *Id.* Cuando se utiliza un documento falso a sabiendas de tal circunstancia, se puede inferir que *"se intenta defraudar a otra persona"*. *Id.*

La firma en un cheque constituye un escrito, a los efectos del Artículo 7 del Código Penal, y su falsificación, con el propósito de defraudar al señor Levy, depositando la apelante tales instrumentos en la cuenta bancaria, constituyó, en efecto, una violación diáfana al Artículo 272 del Código Penal.

Así, se desprende del testimonio de los testigos de cargo y de la propia apelante, que, ésta bajo una supuesta autorización del tenedor de los cheques, señor Levy, hijo, firmó con el nombre del señor Levy, los mencionados instrumentos. En consecuencia, la firma que consta en los cheques es una falsa, independientemente de la supuesta autorización otorgada por el señor Levy. Véase, *Pueblo v. Fernández Simono, supra.* La conducta de la apelante de endosar con el nombre de Levy, hijo, los cheques expedidos a favor de éste y negociar tales instrumentos, haciéndolos pasar como genuinos, para depositarlos en su cuenta personal, configura el delito de Posesión y Traspaso de Documentos Falsificados comprendido en el Artículo 272 del Código Penal. En este sentido, la prueba demostró que al cierre del estado de cuenta, la apelante utilizó prácticamente todo el dinero apropiado ilegalmente para atender asuntos personales, aduciendo que parte de ese dinero lo obtuvo en calidad de préstamo.

## V

Un foro apelativo no debe revocar una convicción a base de un planteamiento de insuficiencia de prueba que, en esencia, se reduce a uno de credibilidad de los testigos. *Pueblo v. Hernández,* 126 D.P.R. 427, 446 (1990).

Luego de un análisis de la totalidad de la prueba que el foro recurrido tuvo ante sí, concluimos que, no empece el diligente esfuerzo de la defensa en este caso, los errores invocados no se cometieron. Ante ello, se confirma la sentencia apelada.

Notifíquese.

Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2004 DTA 124

**1.** Los dos cargos de apropiación ilegal imputan cada uno la apropiación de $20,000.00 pertenecientes a Francisco Levy, hijo, y/o su sucesión. Los dos cargos de Infracción al Art. 272 del C.P. imputan, cada uno, que poseyó, usó, pasó o circuló como genuino o verdadero cheque por la cantidad de $20,000.00 a nombre de Francisco Levy a sabiendas que era falso, alterado, falsificado y/o imitado.

**2.** *"Erró el Honorable Tribunal de Primera Instancia, Sala de Aguadilla, al admitir como evidencia documental las alegadas firmas contenidas en los cheques presentados por el ministerio público como parte de su prueba documental sin presentar prueba pericial de calígrafo alguno que sostuviera la veracidad de las mismas. Dicha admisión fue realizada, a pesar de haber sido objetada por la defensa oportunamente y con el fundamento correcto.*

*Erró el Tribunal "a quo" al declarar no ha lugar la absolución perentoria, presentada al amparo de la Regla 135 de las de Procedimiento Criminal, basada en la insuficiencia de la prueba presentada por el ministerio fiscal; al no evidenciarse los requisitos estatutarios de los delitos imputados y al demostrarse que ninguno de los testigos de cargo tenía conocimiento personal de los hechos que motivaron las acusaciones.*

*Erró el Honorable Tribunal de Primera Instancia, Sala de Aguadilla, al encontrar a la acusada-apelante, de epígrafe, culpable en cuatro de las seis acusaciones, en su contra radicada; no habiendo el ministerio cumplido con el mandamiento constitucional de probar los delitos más allá de toda duda razonable y no haber rebatido la presunción de inocencia que cobija a todo acusado en un procedimiento criminal en todo momento."*

**3.** La Regla 135 reza:

*"Queda abolida la moción para que se ordene un veredicto absolutorio. El tribunal, a instancia propia o a instancia de un acusado, decretará su absolución perentoria en uno o varios cargos de la acusación o denuncia luego de practicada la prueba de una o de ambas partes si la misma fuere insuficiente para sostener una convicción por ese cargo o cargos.*

*De presentarse una moción de absolución perentoria, luego de practicada toda la prueba, el tribunal podrá reservarse su resolución, someter el caso al jurado y resolver la moción, bien antes del veredicto. Si el tribunal declarare sin lugar la moción antes de rendirse un veredicto de culpabilidad o de disolverse el jurado sin veredicto, la moción podrá reproducirse entro del término jurisdiccional de los cinco (5) días de rendido el veredicto o disuelto el jurado, siempre que no se hubiere dictado sentencia."*

**4.** El Artículo 271 dispone textualmente como sigue:

*"Toda persona que con **intención de defraudar a otra hiciere, en todo o en parte, un documento o escrito falso, mediante el cual se creare, transfiriere, terminare o de otra forma afectare cualquier derecho, obligación o interés,** o que falsamente alterare, limitare, suprimiere o destruyere, total o parcialmente, uno verdadero, será sancionada con pena de reclusión por un término fijo de nueve años. De mediar circunstancias agravantes, la pena fija podrá ser aumentada hasta un máximo de catorce (14) años; mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de seis (6) años."* (Énfasis suplido).